# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-KA-00676-SCT

*HUGH WILTON McGOWEN, JR.*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT: 01/22/2002
TRIAL JUDGE: HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED: JACKSON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: ROSS PARKER SIMONS
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: JOHN R. HENRY

DISTRICT ATTORNEY: ROBERT KEITH MILLER
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 09/11/2003
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE McRAE, P.J., EASLEY AND CARLSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Hugh Wilton McGowen, Jr. (McGowen) was indicted for the crime of capital murder by the April 2000 Jackson County Grand Jury. More specifically, the indictment charged McGowen with the murder of Shelby Lynn Tucker while in the commission of the crime of kidnapping. Miss. Code Ann. § 97-3-19(2)(e). Following a four-day trial, a jury found McGowen guilty of capital murder and thereafter, upon being given the option of finding that McGowen could be sentenced to death or life without parole, the jury found that McGowen should be sentenced to life without parole in the state penitentiary. Miss. Code Ann. § 99-19-101(1).  Four days after the jury verdict, the trial court entered its judgment consistent with the

jury verdict and sentenced McGowen to life imprisonment without the benefit of parole. Miss. Code Ann. § 99-19-101(1); Miss. Code Ann. § 47-7-3(1)(e) (Supp. 2001). McGowen's motion for a new trial was denied on March 21, 2002, and from that order McGowen has perfected this appeal.

## FACTS AND PROCEEDINGS
## IN THE TRIAL COURT

¶2. On February 27, 2000, at approximately 8:00 a.m., Vicki McGowen, McGowen's sister-in-law, called 911 to report missing her 4-year-old granddaughter, Shelby Lynn Tucker. Upon arriving at Vicki's residence, the Jackson County Sheriff's Deputies learned that Vicki put Shelby to bed around 10:00 p.m on February 26, 2000, and woke the following morning to discover her missing. The Sheriff's Deputies found no signs of forced entry and began a search for the absent child. Vicki told Deputy Sheriff Terry Dosher that McGowen had been the last person at her home around 2:00 a.m. that morning, February 27, 2000. Charles McGowen, Vicki McGowen's husband and Shelby's step-grandfather, added that his brother, Hugh McGowen, "liked little girls." At this point, Deputy Dosher sought to speak with McGowen.

¶3. McGowen initially reported no knowledge of Shelby's whereabouts. However, during subsequent conversations with law enforcement officers, McGowen revealed the location of Shelby's body and produced objects related to her murder. On the afternoon of February 28, 2000, Sergeant Eddie Stewart and Lieutenant Louie Miller of the Pascagoula Police Department spoke with McGowen at his residence. McGowen dictated a map to the officers leading them to Shelby's body, and produced a blue plastic bag containing a blanket. "This is Shelby's blanket," he told the officers. "This is what she was wrapped up in." After Sergeant Stewart advised McGowen of his *Miranda* rights, McGowen volunteered further cooperation by taking the officers to a bridge where he located a piece of rope that he told the officers was

2

"what I used to strangle her with." Sergeant Stewart transported McGowen to the Jackson County Sheriff's Department, where McGowen offered an eleven-page statement.

¶4.     In his statement, McGowen testified that on the afternoon of February 26, 2000, he and his brother, Charles, traveled the short distance to Mobile, Alabama, to watch remote control car races. During their spectating and on the ride home, McGowen and his brother imbibed Old Milwaukee beer to the point of becoming drunk. When they returned to Charles's home around midnight, Charles passed out in the front seat of McGowen's company truck. Then, according to McGowen's statement, something "just clicked." McGowen took his brother's keys, went inside his brother's house, picked up Shelby, and took her to his residence in Charles's truck.

¶5.     Once inside his residence, McGowen made sexual contact with Shelby, touching her vagina with his fingers. Forensic reports later showed vaginal distension but no evidence of semen in or around Shelby's genitalia. McGowen maintained he did not have sex with Shelby and that he remained clothed the entire time he was with Shelby. Whatever the contact, Shelby told McGowen he was hurting her and began to scream. McGowen panicked and grabbed a piece of rope, the kind he used at work everyday to tie off cable. He formed a "Chinese finger" with the rope and began strangling Shelby. Believing he had killed her, McGowen put Shelby in his brother's truck and drove to a nearby wooded area. Along the way, Shelby regained consciousness and began crying. Further panicked, McGowen struck Shelby in the head with a small sledge hammer or mallet he found in his brother's truck. He left Shelby's body in the woods and returned to Charles's house.

¶6.     Charles was no longer in McGowen's truck when McGowen returned to Charles's residence. Upon waking from his stupor without keys to his house, Charles slept in a shed in his yard. McGowen retrieved his truck and returned to his residence. When he got home, McGowen realized he still had the rope and

3

Shelby's blanket. He took the rope to a bridge and threw it over the side. He wrapped the blanket in a plastic bag and stuffed it in a mattress in his house.

¶7.     The trial began on January 15, 2002. The State called fourteen witnesses. Vicki McGowen was the State's first witness. Vicki testified that she kept Shelby the Saturday night Shelby was abducted. Vicki had taken Shelby and another grandchild to her grandson's basketball game and to the shopping mall during the day. That night, she put Shelby and the other grandchildren to bed around 10:00 p.m. and locked the door to her trailer home. When Shelby was missing the next morning, Vicki called 911. Vicki further testified that she received a letter addressed to her husband, Charles, from McGowen which attempted to shift the blame to Charles. Disguising her handwriting to look like her husband's, Vicki sent a one-line reply to McGowen, "Better thee than me. Ha! Ha!" hoping it would anger McGowen.

¶8.     The State's second witness was Miranda Tucker Tames, Shelby's mother. Miranda testified that her mother, Vicki, kept Shelby while she was working Saturday February 26, 2000. Over defense objection, Miranda also opined she believed McGowen murdered her daughter.

¶9.     Terry Dosher, who was the first responding officer to the scene, testified he filed the initial offense report. He also testified on cross-examination that Charles told him that McGowen "likes young girls."

¶10.    The State called two crime scene investigators, who assisted in photographing and searching for evidence in this case. Through the first investigator, Rodney Fountain, the State introduced a photograph of Shelby's face over defense counsel's objection and motion in limine for the photograph to be excluded from evidence. Defense counsel averred the photograph had no probative value, was gruesome, and would prejudice the jury. Defense counsel further contended the photograph should only be introduced, if at all, by the State's pathologist, Dr. Paul McGarry, who would make it as "gruesome as he possibly can," but should not be introduced by a non-medical expert. During the redirect examination of Investigator Fountain,

4

the State made several references to digital and penile penetration and the presence or absence of seminal fluids in sexual assault investigations in general. Defense counsel objected repeatedly, but was consistently overruled by the trial judge. Through the second investigator, former Jackson County Sheriff's Deputy Dean Reiter, a mallet was marked for identification, but it was not admitted into evidence through Investigator Reiter.

¶11.    Next, the State called Philip Holt, McGowen's neighbor, who testified that he saw McGowen drive off erratically in his brother Charles's truck early on the morning of Sunday February 27, 2000, and that McGowen returned to get something out of his own truck and left again. Cross-examination revealed Holt wore glasses, had drunk two beers at the Isle of Capri Casino between 11:00 p.m. and 2:00 a.m., did not live directly across from McGowen's house where his truck was parked, and had bought a boat from McGowen's ex-wife.

¶12.    The State's next witness was Melissa Schoene, a hair and fiber analyst with the Mississippi Crime Lab at the time this case was processed. Schoene described her training and was accepted as an expert witness by the trial court. Schoene testified that the microscopic comparison of hair samples did not allow an analyst to conclude that a "particular hair came from a particular person," but rather that one of three conclusions could be reached: (1) no similarities between samples, (2) the samples exhibit the same characteristics so as to be indistinguishable, or (3) the samples exhibit some similarities and some differences.

¶13.    Schoene's samples for comparison in this case were from "sexual assault kits" taken from McGowen, his brother Charles, and Shelby. At trial, Schoene was presented with three items for identification: black tape, a blue bag, and a baby blanket. Schoene identified the items as evidence she had examined in the crime lab, but a chain of custody objection prevented the State from introducing the items

5

into evidence via Schoene. Additionally, Schoene testified she had examined hair samples taken from these exhibits, compared them with samples from Charles and Hugh McGowen, and concluded she could exclude neither man as the donor of the hair. Over a defense objection, Schoene further testified that a tear on a roll of tape from Hugh McGowen's home matched tears in the tape removed from the blue plastic bag.

¶14. The State's next witness was Dr. Paul McGarry, a forensic pathologist from the coroner's office of Orleans Parish, Louisiana, and other coroner's offices along the Gulf Coast. Dr. McGarry, who performed the autopsy on Shelby's body on February 29, 2000, testified that his observations revealed a violent struggle had taken place. He found her vaginal opening stretched and torn, abrasions on her inner thighs, eleven dark brown hairs around her genital region, bruises on her face, knees, shins, hips, and shoulders, bleeding in the tissues of her neck indicating strangulation, bleeding and tearing in the tissues of her mouth indicating smothering, and five deep round disk-shaped bruises on the left side of her head where her skull had been fractured and crushed. Dr. McGarry further testified that the distension of Shelby's vagina was caused "by forcing something into the vagina." The most common way this would occur would be by "pushing a penis in against resistance," but the object could have been a finger or "even a foreign object."

¶15. Despite defense objections, photographs were introduced comparing Shelby's head injuries to the mallet found in Charles McGowen's truck. Dr. McGarry was permitted to testify that the diameter of the mallet and the diameter of the wound patterns were the same. Both cross-examination and redirect examination elicited further testimony about vaginal penetration and tearing. On redirect, Dr. McGarry testified that tearing and stretching of vaginal tissue would be a painful experience sufficient to cause a child to cry out in pain.

¶16. Next, the State called Amy Winters, a forensic biologist specializing in serological examination with the state crime lab. Defense counsel objected to Winters's testimony because she did not actually perform the crime lab examinations. Winters testified on behalf of Elizabeth Howell, her former crime lab co-worker, who actually performed the examinations. Winters's role was to review Howell's report to ensure she performed the examinations properly. Over continuing defense objections to chain of custody and to the fact that Winters did not examine the evidence first hand, Winters was allowed to testify that a test for semen on a comforter was negative, tests for blood on the mallet were negative, tests for semen on swabs collected as part of Shelby's sexual assault kit were negative and tests for semen on Shelby's blanket were negative.

¶17. The State called Charles McGowen who corroborated McGowen's account of their trip to Mobile to view remote control car races, their heavy drinking, Charles's passing out in McGowen's truck on the ride home, and his sleeping in the shed after waking up with no keys to get in his trailer.

¶18. Lieutenant Mick Sears and Sergeant Carl Cone from the Jackson County Sheriff's Department were called as State witnesses to establish the chain of custody on various items of evidence. Lt. Sears, of the Criminal Investigation Division, testified to the chain of custody of several items including the roll of black tape and the sexual assault kits. Lt. Sears further testified to the best of his knowledge that there was never any tampering with the evidence. Sgt. Cone, the evidence custodian, testified that various pieces of evidence were securely stored and locked up, free from tampering, addition, and deletion.

¶19. The State's final witness was Sergeant Eddie Stewart, commander for the Jackson County narcotics task force and one of the officers to whom McGowen confessed. Without prior notice to the trial court, as Sgt. Stewart was taking the stand, defense counsel moved to suppress McGowen's confession statement to Sgt. Stewart and Lt. Miller on grounds that McGowen was not properly advised of his

*Miranda* rights. The court denied the motion. Through his testimony, Sgt. Stewart authenticated the February 28, 2000, conversation he and Lt. Miller had with McGowen at McGowen's house, the map McGowen provided directing them to Shelby's body, the blue bag McGowen produced containing Shelby's blanket, the rope which had been flung over the side of a bridge(and to which McGowen led the officers), and the subsequent eleven-page confession statement McGowen gave at the Sheriff's Department after being advised of his *Miranda* rights multiple times.

¶20.     When the State rested, defense counsel moved for a directed verdict. The court denied the motion. The defense then called five witnesses. Its first witness was former shift captain Tony Greer, the second officer on the scene, who testified to the initial stages of the investigation. Investigator Robert Carew, the Jackson County criminal investigation supervisor, was the defense counsel's second witness, and he testified about the beginnings of the investigation and about preliminary statements by McGowen denying involvement in Shelby's disappearance.

¶21.     Officer John Gaffney of the Moss Point Police Department, also assigned as an FBI task force agent, testified he went to McGowen's trailer on the afternoon of February 28, 2000, to find McGowen and Sgt. Stewart in a conversation. Officer Gaffney entered the trailer and was introduced to McGowen, but at no point did Officer Gaffney hear McGowen make a confession. When Lt. Miller returned, he and Sgt. Stewart departed with McGowen, and at Sgt. Stewart's request, Officer Gaffney remained at the trailer until the Sheriff's Department arrived with a search warrant.

¶22.     For the defendant's fourth witness, Lt. Mick Sears, who had testified in the State's case-in-chief, was placed back on the witness stand. Lt. Sears testified that he briefed the officers involved in this case, including Sgt. Stewart and Lt. Miller, on the morning of February 28, 2000, around 10:00 a.m. at the Jackson County Sheriff's Department.

8

¶23.    Hugh McGowen was the final witness for the defense. McGowen described his upbringing, his sparse contact with his parents, his relationship with his brother, his employment history and the events of the day of February 26, 2000. He recounted the trip he and his brother Charles took to the remote control car races that evening, testifying they both drank consistently before, during, and after their attendance at the races. McGowen further testified that upon their return, Charles abducted Shelby and brought her to McGowen's house. According to McGowen, Charles took Shelby into McGowen's bedroom and said he would sleep there with her. Later, McGowen claimed he woke to hear Shelby crying. When he went to the door, Charles told him Shelby was just scared because she did not know where she was. After going back to sleep, McGowen said he was awakened again, this time by Charles telling him he had strangled Shelby and asking McGowen to help him. They decided they would take Shelby's body to a nearby state-owned crane refuge land. McGowen said he drove and when they got there he waited in the car in pitch dark while Charles took Shelby's body out into the woods. After being gone for a few moments, Charles returned and according to McGowen said, "I can't leave her like that." Charles left again, and when he returned he laid a mallet on the floorboard of the truck and told McGowen he had hit her in the head. When they got back to McGowen's house, McGowen said his brother told him he still had the rope he used to strangle Shelby in his pocket. According to McGowen, they left again and as they drove by a bridge, Charles pitched the rope over the side. They then returned to Charles's trailer where they agreed Charles would sleep in his truck and claim he passed out there and McGowen would return to his house to sleep.

¶24.    McGowen testified he never told investigators this story but rather incriminated himself to protect his brother. McGowen said he wrote his brother a letter from jail asking Charles to come forward and tell the truth. McGowen said that when he provided the taped confession, he had no idea how many times Shelby had been struck in the head, which was why he told the police she was struck once when in fact

9

she was struck five times. On cross-examination, McGowen testified that he languished in jail for a year and a half before writing the letter to his brother, meanwhile telling only his lawyer that he did not kill Shelby. The defense objected to questions concerning communication between McGowen and his lawyers.

¶25.    After McGowen's testimony, the defense renewed its motion for a directed verdict, and the motion was denied. During the jury instruction conference, the State was permitted an involuntary intoxication instruction over the defense's objection. After closing arguments, the jury began its deliberations. The same day, the jury returned with its verdict finding McGowen guilty of capital murder, and a poll of the jury revealed a unanimous vote.   Upon a separate sentencing hearing being conducted and sentencing instructions being submitted, the jury deliberated and ultimately unanimously found that McGowen should be sentenced to life without parole. Consistent with the jury verdict, the trial court subsequently sentenced McGowen to a term of life imprisonment without parole.

## DISCUSSION

¶26.    The standard for reviewing a motion for a new trial is abuse of discretion. *May v. State*, 460 So.2d 778, 781 (Miss. 1984) (citing *Neal v. State*, 451 So.2d 743, 760 (Miss. 1984)). Because a motion for a new trial is addressed to the trial court's sound discretion, the trial court's ruling will not be reversed unless the trial court's judicial discretion was so abused as to be prejudicial to the accused. Id.

¶27.    Similarly, under this Court's standard of review, the admissibility of evidence rests within the trial court's discretion. *Crawford v. State,* 754 So.2d 1211, 1215 (¶ 7) (Miss. 2000). Unless the trial court abused its judicial discretion to the point of prejudicing the accused, this Court must affirm the trial court's ruling. *Id. See also Herring v. Poirrier,* 797 So.2d 797, 804 (¶ 18) (Miss. 2000); *Graves v. State,* 492 So.2d 562, 565 (Miss. 1986); *Shearer v. State,* 423 So.2d 824, 826 (Miss. 1982).

**I.    WHETHER McGOWEN WAS DENIED HIS FUNDAMENTAL AND CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING EVIDENCE AND ARGUMENT OF OTHER CRIMES, INCLUDING SEXUAL ASSAULT AND RAPE, WITH WHICH McGOWEN WAS NOT CHARGED.**

¶28.    McGowen contends his trial was fundamentally flawed and his constitutional rights were violated because the State repeatedly implicated him in sexually battering, assaulting, or raping the victim, Shelby Lynn Tucker, when he was not charged with such crimes in the State's indictment. In particular, McGowen documents 101 references in the trial transcript to sexual assault, thirty-four references to rape, and thirty references to the victim's vagina. McGowen also points out Dr. McGarry's attestation and graphic description of the sexual assault Shelby endured prior to her death as particularly prejudicial testimony. Because it was not offered to establish an element of the underlying felony offense of kidnapping or murder, the crimes with which he was charged, McGowen argues that this testimony was irrelevant. Because of such repeated references to sexual assault over the course of his trial, McGowen avers his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were breached, as well as his rights under Article 3, Sections 14 and 26 of the Mississippi Constitution. So, in essence, the crucial issue before the Court here is not so much one of the other crimes provisions of Miss. R. Evid. 404(b), as it is one of relevance and probative value vs. prejudicial effect pursuant to the provisions of Miss. R. Evid. 401, 402, and 403, respectively.

¶29.    In support of his contentions, McGowen cites this Court's decision in *Foster v. State*, 508 So.2d 1111 (Miss. 1987), *overruled on other grounds by Powell v. State*, 806 So.2d 1069, 1080 (¶ 32) (Miss. 2001). *Foster* set forth the process for determining the admissibility of expert testimony. 508 So.2d at 1117. Following the Mississippi Rules of Evidence 401, 402, and 403, *Foster* explained that to be

admissible, testimony must first pass the threshold requirement of relevance.[1] *Id.* Relevant evidence must then survive a balancing test by which it may be excluded "if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* (citing Miss. R. Evid. 403) (emphasis in original). A trial court presented with a Rule 403 objection must perform this balancing test. *Id.* Pursuant to *Foster*, McGowen argues that even if testimony related to the sexual assault of Shelby was relevant it should have been ruled inadmissible under the balancing test of *Foster* and Miss. R. Evid. 401, 402, 403 weighing the probative value of the testimony against its prejudicial effect.

¶30. The testimony challenged in *Foster* was that of an expert testifying that a knife found in the defendant's car "could have" caused the victim's fatal wound. 508 So.2d at 1118. This passed the threshold test of relevance, but a majority of this Court in *Foster* objected to the phrase "could have," which connoted only a possibility, thereby limiting the probative value of the testimony while maximizing its tendency to mislead the jury. *Id.* On remand, this Court ruled that the experts could testify in a new trial, but they should avoid the terms "possible" and "could have." *Id.*

¶31. McGowen also relies on *Tucker v. State*, 403 So.2d 1274 (Miss. 1981), a marijuana possession case, to assert that the general rule in a criminal trial is to confine testimony to the charge for which the accused is on trial. The prosecution is not allowed to aid the proof against the accused by showing he committed other offenses. *Id.* at 1275 (quoting *Sumrall v. State*, 257 So.2d 853 (Miss. 1972)). In

---

[1] *Foster* quotes Miss. R. Evid. 401 to define relevant evidence as "evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." 508 So.2d at 1117 (emphasis in original). *Foster* further noted that the comment to Miss. R. Evid. 401 provided that Miss. R. Evid. 401 was a broad definition favoring admissibility. *Id.*

12

*Tucker*, this Court remanded the defendant's narcotics possession conviction because there was testimony elicited by the prosecution that, on a separate occasion, the defendant sold marijuana from the trunk of his car. *Id.* at 1276. This sale occurred before police found marijuana in the defendant's hotel room, and was thus a separate event, testimony to which only served to prejudice the jury. *Id.*

¶32. In *Tucker* this Court ruled that the testimony in question violated the general rule that the prosecution cannot elicit proof of crimes for which the defendant is not indicted, and that this testimony did not fall within any of the exceptions to the general rule. *Id.* However, *Tucker* noted the several exceptions to the general rule.

> It is well settled in this state that proof of a crime distinct from that alleged in an indictment is not admissible against an accused. There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive, and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.

*Tucker*, 403 So.2d at 1276 (quoting *Gray v. State*, 351 So.2d 1342 (Miss. 1977) and *Riley v. State*, 254 Miss. 86, 180 So.2d 321 (1965); citing *Smith v. State*, 223 So.2d 657 (Miss. 1969); *Cummings v. State*, 219 So.2d 673 (Miss. 1969)).

¶33. Finally, in his reply brief, McGowen asserts that the violations of his fundamental constitutional rights constitute plain error and structural error, are therefore non-waivable, and must cause this Court to remand his case for a new trial. McGowen concedes his trial counsel withdrew his Motion in Limine concerning references to sexual assault and failed to object to each sexual assault reference made during trial.

13

Nonetheless, under the doctrines of plain error and structural error, he urges that this Court is duty bound to remand his conviction.[2]

¶34. McGowen asks this Court to broadly apply *Foster* to hold that the challenged testimony in this case is irrelevant, or if relevant, that it fails the balancing test weighing probative value against prejudicial effect. However, we have continuously held that the discretion to determine relevancy and weigh the interests of admitting testimony rests soundly with the trial court. 508 So. 2d at 1117 (citing *United States v. Chalan*, 812 F.2d 1302 (10th Cir. 1987); *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351 (5th Cir. 1983)). "Because of this discretion vested in the trial court, our task as an appellate court reviewing a 403 determination is not to engage anew in the 403 balancing process. Rather, we simply determine whether the trial court abused its discretion in weighing the factors and admitting or excluding the evidence." *Id.* at 1118.

¶35. The testimony in *Foster* easily passed the initial relevancy test because the fact that a knife found in Foster's car *could have* caused the victim's fatal wound obviously has a tendency to make it more or less probable that the knife found in Foster's car *was* used to kill the victim. *Id.* at 1118. As in *Foster*, the challenged testimony in the case sub judice that McGowen sexually assaulted Shelby has a tendency to make it more or less probable that McGowen abducted Shelby the night she was killed, that he had a motive to behave irrationally and kill her, that the confession he gave investigators was true and accurate.

---

[2]In his reply brief, McGowen cites a different *Foster v. State*, in which a dissenting opinion stated, "Plain error occurs when it is established that an error not raised previously affects fundamental rights." 716 So.2d 538, 542 (¶ 20) (Miss. 1998) (McRae, J., dissenting). McGowen defines structural error as error which infects the trial so as to make it fundamentally unfair or an unreliable vehicle for determining guilt or innocence. *Johnson v. State*, 768 So.2d 934, 937-38 (Miss. Ct. App. 2000).

¶36.    Passing the threshold test of relevance, we turn to the balancing test to determine whether the trial court abused its discretion in weighing the probative value of the testimony in question against its prejudicial effect on the jury. In *Foster*, the challenged testimony failed the balancing test because the phrase "could have" connoted only a possibility, thereby minimizing the testimony's probative value while maximizing its tendency to prejudice the jury. *Id.* Unlike *Foster*, however, the testimony of Dr. McGarry and others did not employ or rely on phrases such as "could have" or "possible." Rather, Dr. McGarry merely testified as to the condition of Shelby's body, including her genitalia, when he performed his autopsy. An additional difference between *Foster* and this case is that defense counsel himself in the case sub judice elicited numerous references to sexual assault throughout the trial while there were no indications of such complicity in *Foster*. For instance, in defense counsel's cross-examination of Dr. McGarry, the following exchange took place.

Q.    Okay. And, additionally, you testified on direct examination that she had been forcefully penetrated?

A.    Yes.

Q.    And you don't know with what, right?

A.    It's something that would dilate the opening of her vagina to -- enough to tear in a circumferential manner, like a star-shaped tearing, which means something round or near round is being pushed in with force.

Q.    But you don't know what that could have been?

A.    I don't know exactly what it could be. The most likely thing is a penis.

Q.    All right.

A.    Male sex organ.

Q.    All right. At autopsy, do you do vaginal swabs?

A. Yes, sir.

Q. For what purpose?

A. For the purpose of detecting any ejaculate, any semen that might be there or other substances that might be deposited there.

Q. And is that -- do you do any other swabs about the body?

A. To the mouth and the anus as well.

Q. And do you preserve those?

A. They are placed in a kit that includes other specimens from the autopsy and they're all preserved.

Q. Is that called a rape kit?

A. Yes, sir.

In this exchange alone, defense counsel not only reopened a line of questioning which McGowen now claims was irrelevant and prejudicial, but he also introduced some of the very terms now objected to on appeal, such as "vaginal swab" and "rape kit." It would be inequitable to allow defense counsel to sabotage the fairness of his client's trial only to use defects he introduced to prevail on appeal. For the foregoing reasons, this Court cannot say that the trial court abused its discretion in weighing the probative value versus the prejudicial effect of the testimony of Dr. McGarry and others when deciding to admit such testimony.

¶37. We turn now to McGowen's reliance on *Tucker* as well as his assertions of plain and structural error. While the exceptions to the general rule against admitting testimony about crimes with which the defendant is not indicted did not apply in *Tucker*, they do apply to the case sub judice. If one or more of these exceptions applies, then the question of plain or structural error need not be reached because the assignment of error averred in this first issue of McGowen's appeal would become moot.

16

¶38.    Consistent with the exceptions to the general rule against admitting testimony about crimes for which the defendant is not indicted, proffered in *Tucker*, this Court has held that "even though it may reveal other crimes, evidence or testimony may be given in order to tell a rational and coherent story of what happened and where it is substantially necessary to present a complete story." *Flowers v. State*, 773 So.2d 309, 319 (¶ 28) (Miss. 2000) (citing Miss. R. Evid. 404(b); *Mackbee v. State*, 575 So.2d 16, 27-28 (Miss. 1990); *Brown v. State*, 483 So.2d 328, 330 (Miss. 1986)). In *Flowers* this Court added that evidence of another crime is "also admissible if it sheds light upon the motive or if it forms a part of a chain of facts intimately connected so that in order to interpret its general parts, the whole must be heard." *Id.* (citing *Davis v. State*, 530 So.2d 694, 697-98 (Miss. 1988)). An exception to the general rule is also granted "when the evidence is integrally related in time, place, and fact to the crime for which the defendant is being tried." *Id.* (citing *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987); *Ladner v. State*, 584 So.2d 743, 758 (Miss. 1991); *Wheeler v. State*, 536 So.2d 1347, 1352 (Miss. 1988)). Testimony about another crime has been admitted when the other crime formed "a single transaction or closely related series of transactions in relation to the crime charged." *Id.* (citing *Robinson v. State*, 497 So.2d 440, 442 (Miss. 1986); *Davis v. State*, 476 So.2d 608, 609 (Miss. 1985)).

¶39.    In *Eubanks v. State*, 419 So.2d 1330 (Miss. 1982), the defendant, who was convicted of simple assault on a law enforcement officer, appealed when the entire facts and circumstances of his arrest were presented to the jury. Eubanks contended the testimony was inadmissible evidence of another crime because he had been arrested on other charges. This Court, however, held that the officer's testimony describing the warrant he held for the accused's arrest was admissible because it showed the officer was acting within his authority and was substantially necessary to present a complete story. *Id.* at 1332.

¶40.    In *Davis*, the defendant, who was convicted of armed robbery, appealed when a witness testified that property was stolen from his car that the defendant carjacked. 530 So.2d at 697. Davis argued this testimony was inadmissible because he was not on trial for stealing this property. *Id.* Even though the trial judge sustained the defendant's objection at trial, this Court held that there was no reversible error because the other crimes mentioned were part of the res gestae of the crime charged and helped shed light on the appellant's motive. *Id.* at 698.

¶41.    In *Robinson*, the defendant, who was convicted of murder, claimed the trial court committed reversible error by allowing the prosecution to question the defendant about whether he took the victim's wallet out of the victim's pocket. 497 So.2d at 441. Robinson argued this line of questioning was inadmissible evidence of another crime. *Id.* This Court, however, held that the prosecution's question about the wallet were so closely related to the crime charged as to form a single transaction or closely related series of transactions. *Id.* at 442 (citing *Minor v. State,* 482 So.2d 1107 (Miss. 1986); *Turner v. State,* 478 So.2d 300, 301 (Miss. 1985); *Neal v. State,* 451 So.2d 743 (Miss. 1984)). Accordingly, this Court found no reversible error. *Id.* at 443.

¶42.    McGowen argues that the prosecution's solicitation of testimony about sexual assault and possible rape suffered by the victim was inadmissible evidence of another crime, which served to prejudice the jury. As in *Eubanks*, however, testimony about the sexual assault and possible rape was substantially necessary to present a complete account of what happened to Shelby on the night she was killed. *Cf.* 419 So. 2d at 1332 (holding that testimony describing the warrant for the accused's arrest was admissible because it showed the officer was acting within his authority and was substantially necessary to present a complete story to the jury).

¶43.    Testimony about the sexual assault and possible rape of Shelby was also admissible because it described part of the res gestae of the crime charged and helped shed light on McGowen's motive. *Cf. Davis*, 530 So. 2d at 697 (holding testimony about other stolen property, which constituted a separate crime from the one charged, was admissible because it formed part of the res gestae of the crime charged and helped shed light on the appellant's motive). Understanding that McGowen likely sexually assaulted Shelby explains why she might have begun crying and why he might have begun acting irrationally and strangled her. In short, it corroborates the confession he provided investigators.

¶44.    Finally, testimony such as Dr. McGarry's about the sexual assault and possible rape Shelby endured prior to her death was properly admitted because those events were part of the series of events that led to her death. As in *Robinson*, the facts of Shelby's sexual assault and possible rape were so closely related to her murder that they formed a single transaction or series of transactions. *Cf. Robinson*, 497 So.2d at 443 (holding no reversible error when testimony about another crime was so closely related to the crime charged that it formed a single transaction or series of transactions).

¶45.    These exceptions to the general rule against admitting testimony about other crimes are applicable in the case at bar, even though they were not applicable in *Tucker*. In *Tucker*, this Court remanded the defendant's drug possession conviction due to testimony admitted during trial that, on a separate occasion, the defendant sold marijuana from the trunk of his car. 403 So.2d at 1276. The defendant was not on trial for selling narcotics, and this sale occurred before police found marijuana in the defendant's hotel room. *Id.* The sale was thus a separate event and may or may not have been related to the defendant's possession of marijuana in his hotel room. The marijuana sale from the car trunk and the marijuana possession in the hotel room were not necessarily related or part of the same story of events. By contrast, in the case sub judice the sexual molestation and possible rape of Shelby were integrally related to her murder such that

19

one could not coherently present the facts of her demise without reference to them. These unfortunate facts were part of the res gestae of the murder with which McGowen was charged and they shed light on McGowen's motive. They were so closely related that they can be said to have formed the same transaction or series of transactions.

¶46. For the foregoing reasons, we cannot say that the trial court abused its discretion by admitting testimony, such as that of Dr. McGarry, about the sexual assault and possible rape of Shelby which occurred in the moments preceding her murder. McGowen's claims that his trial was fundamentally flawed and that his constitutional rights were violated due to inadmissible testimony that implicated him in sexually assaulting or raping the victim are without merit.

**II.      WHETHER THE TRIAL COURT ERRED IN PERMITTING THE FORENSIC PATHOLOGIST TO RENDER AN EXPERT OPINION THAT THE SHAPE OF THE MALLET (SE-36b) WAS CONSISTENT WITH INJURIES TO THE VICTIM'S HEAD WHEN THIS CONCLUSION WAS DRAWN BY COMPARING GRUESOME PHOTOGRAPHS DURING TRIAL AND WHEN THIS CONCLUSION WAS NOT TENDERED IN DISCOVERY.**

¶47. McGowen's second assignment of error avers that Dr. McGarry should not have been permitted to render his expert opinion that the mallet (SE-36b), found in the back of Charles McGowen's truck, matched the injuries to Shelby's head. Dr. McGarry used photographs (SE 44, 45, 46, and 47) to make comparisons and draw the conclusion that the markings in Shelby's skull were consistent with the shape, size, and contour of the mallet. At trial McGowen's counsel objected to this testimony, and with the jury out, Dr. McGarry conceded he could not say the mallet in evidence was *the* instrument used to injure Shelby's skull. McGowen's trial counsel included Dr. McGarry's autopsy report in his motion for a new trial, emphasizing that the report contained no comparisons of the mallet to the marks on Shelby's skull.

McGowen pointed out in that motion and on this appeal that the prosecution never tendered any discovery suggesting Dr. McGarry would offer such comparisons or opinions.

¶48. Additionally, McGowen's appellate brief attempts to impeach Dr. McGarry's testimony by citing cases, both past and pending, in which Dr. McGarry "withheld opinions and conclusions . . . only to spring them on trial counsel during testimony." McGowen proffers *Harrison v. State*, 635 So.2d 894 (Miss. 1994), discussed *infra*, as an exemplary case in which Dr. McGarry's improper testimony caused reversal.

¶49. McGowen further asserts, "Dr. McGarry is not a tool-mark comparison expert," and "his testimony was rank speculation" that violated McGowen's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as Article 3, §§ 14 and 26 of the Mississippi Constitution. On this count McGowen claims Dr. McGarry's testimony was prohibited based on *Kolberg v. State*, 704 So.2d 1307 (Miss. 1997); *Fowler v. State*, 566 So.2d 1194, 1199 (Miss. 1990); *Goodson v. State*, 566 So.2d 1142, 1147-48 (Miss. 1990); and *Kelly v. State*, 735 So.2d 1071 (Miss. Ct. App. 1999).

¶50. The first question this Court must answer is whether a forensic pathologist may render an expert opinion at trial as to whether a particular instrument or weapon in evidence was consistent with particular injuries to a victim. This Court has held, "[t]he question of whether an individual is qualified to testify as an expert is committed to the sound discretion of the trial court. This Court does not reverse such decisions absent a showing that this discretion has been abused, that is, that the witness was clearly not qualified." *Duplantis v. State*, 708 So.2d 1327, 1338-39 (¶ 45) (Miss. 1998) (citing *Cooper v. State*, 639 So.2d 1320, 1325 (Miss. 1994)).

¶51. In *Duplantis*, this Court refused to say the trial court abused its discretion when it allowed a forensic pathologist to testify in a murder trial that the wounds suffered by the victim were inflicted by an

object similar to the bolt cutters recovered from victim's truck. *Id.* at 1339. In *Duplantis*, the Court ruled in favor of admitting such testimony even though there was no voire dire cross-examination of the witness, because this witness had testified as an expert pathologist many times in Mississippi courts and was unquestionably qualified. *Id.*

¶52.    In *Holland v. State*, 705 So.2d 307, 341 (¶ 127) (Miss. 1997) (*Holland II*), a death penalty appeal, this Court held that Dr. McGarry's testimony was not rank speculation when he provided testimony remarkably similar to the testimony he tendered in the case at bar. In *Holland v. State*, 587 So.2d 848 (Miss. 1991) (*Holland I*),[3] Dr. McGarry testified the victim died of asphyxiation after being strangled with a t-shirt wrapped around her neck and having undergarments stuffed down her throat. 587 So.2d at 853. Dr. McGarry determined the victim's death in *Holland I* was not caused by the stab wound to her chest, but that she could have languished alive for hours after being stabbed were it not for the asphyxiation. *Id.* Furthermore, Dr. McGarry testified in *Holland I* that the victim's vaginal injuries were caused "by something not as firm and unyielding as a metal or wooden instrument. It has to be a part of a human body or something with that same texture consistency [like a] male sex organ." *Id.*

¶53.    In *Holland II*, this Court held, "[t]he State demonstrated that Dr. McGarry's testimony fell within the bounds of forensic pathology by demonstrating that his expertise dealt with wounds, suffering, and the means of infliction of injury. Our case law, as well as that of other states, permits this type of testimony." *Holland II*, 705 So.2d at 341 (citing *Simmons v. State,* 105 Miss. 48, 57, 61 So. 826, 828 (1913) (physician may testify as to effect of sexual intercourse upon child's female organs)). *Holland II* also held

---

[3]This is the same case as the previously cited *Holland* case of 1997.  The 1991 appeal centered on objections raised during the guilt phase of the trial, while the 1997 appeal dealt with sentencing phase objections.

that discussion of pain by a forensic pathologist is admissible. *Id.* (citing *Whittington v. State*, 523 So.2d 966, 976 (Miss. 1988) (allowing forensic testimony that a victim suffered a fatal heart attack as a result of trauma and stress induced by a beating and robbery). *See also Mitchell v. State*, 792 So.2d 192, 215-16 (Miss. 2001). "Thus, in Mississippi, a forensic pathologist may testify as to what produced [a victim's] injuries. . . and what trauma such an injury would produce." *Holland II*, 705 So.2d at 341.

¶54.     In the instant case, Dr. McGarry did not testify that the mallet found in the back of McGowen's brother's truck in fact caused Shelby's head wounds. Rather, Dr. McGarry simply stated the shape of the mallet was consistent with the shape of the wounds. This is directly analogous to the forensic pathologist's testimony in *Duplantis* that the wounds suffered by the victim were inflicted by an object similar to the bolt cutters recovered from victim's truck. 708 So.2d at 1339.

¶55.     Dr. McGarry's testimony in the case sub judice is distinct from the kind of tool-mark testimony disallowed in *Fowler v. State*, 566 So.2d 1194, 1199 (Miss. 1990). In *Fowler*, the prosecution's objection was sustained by the trial judge when the defense expert witness testified that certain blood stains pictured in a photograph presented at trial were arterial blood squirts from the right side of the victim's head. *Id.* The prosecution objected that the expert could not know whether the squirts were from the victim's head or his finger. *Id.*

¶56.     In McGowen's trial, Dr. McGarry did not testify with the specificity and certitude asserted by the expert in *Fowler*. Dr. McGarry merely stated the shape of the mallet in evidence was consistent with the shape of Shelby's head injuries. He did not assert that the mallet in evidence was *the* weapon in fact used to inflict Shelby's injuries in the same way the expert in *Fowler* testified the photographed blood stains were caused by blood squirts specifically from the victim's head.

23

¶57.    Having determined that a forensic pathology expert may offer an expert opinion at trial about whether a particular instrument in evidence was consistent with particular injuries to a victim, this Court must now resolve whether a discovery violation occurred sufficient to render this portion of Dr. McGarry's testimony improper. McGowen argues there was a fatal discovery violation insofar as the State tendered only Dr. McGarry's autopsy report during discovery, but did not indicate Dr. McGarry would draw comparisons during trial between the mallet and autopsy photographs of the victim's skull. McGowen relies on *Harrison v. State*, 635 So.2d 894, 895 (Miss. 1994), for the proposition that this omission left the defense with no means to challenge Dr. McGarry's comparisons and was a fatal violation of the Mississippi Uniform Rules of Circuit and County Court Practice (URCCC) 9.04.[4]

¶58.    In *Harrison*, the defendant was convicted of capital murder for raping and brutally murdering a seven year-old girl. 635 So.2d at 895. On appeal, this Court found reversible error in the trial court's failure to follow guidelines articulated in *Box v. State*, 437 So. 2d 19 (Miss. 1983). In *Box*, this Court laid out the following procedural steps trial courts must follow when faced with an undisclosed discovery objection:

---

[4] URCCC 9.04(A) states in pertinent part,

> Subject to the exceptions of subsection 'B', below, the prosecution must disclose to each defendant or to defendant's attorney, and permit the defendant or defendant's attorney to inspect, copy, test, and photograph upon written request and without the necessity of court order the following which is in the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecution: (1) Names and addresses of all witnesses in chief... (4) Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and substance of any oral statement made by any such expert; (5) Any physical evidence and photographs relevant to the case or which may be offered in evidence...

1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.

2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.

3. If the defendant does request a continuance the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.[5]

*Id.* at 22-26. *See also* **Harrison**, 635 So.2d at 898.

¶59.    In **Harrison**, Dr. McGarry testified for the State. During the discovery process, the State had provided the defense only a copy of the pathologist's autopsy report, which did not include any opinions as to the instruments that caused the victims death. *Id.* At trial, Dr. McGarry was permitted to testify to a number of possible causes of death and, perhaps most significantly, he was allowed to opine that the victim was raped. *Id.* at 898-99. This was the only evidence of rape the State possessed. *Id.* at 899. The reversible error in **Harrison** occurred when the trial judge flatly denied all defense counsel attempts to invoke the **Box** procedures, to consult with or interview Dr. McGarry to ascertain what opinions he might offer, or to make a proffer of proof. *Id.* at 899-900.

¶60.    **Harrison**, however, noted that a failure to comply with our discovery rule (what is now URCCC 9.04) is not necessarily fatal, but only requires reversal when **Box** has not been followed. **Harrison** 635 So.2d at 898. In **Holland I**, there was no reversible discovery violation when the defense provided Dr. McGarry's autopsy report and "Provisional Autopsy Diagnosis" which contained his opinion on the general time of the victim's injuries. 587 So.2d at 867. **Holland I** found it was foreseeable the prosecution would ask Dr. McGarry to expound on the time element contained in his provisional diagnosis. *Id.* Similarly in

---

[5]URCCC 9.04 is but a codification of **Box** and its progeny.

25

*Mitchell*, this Court held there was no reversible discovery violation or error when the trial judge provided the defense the opportunity to interview Dr. McGarry prior to his sentencing phase testimony and when the defense did not make an objection to McGarry's testimony during the guilt phase of the Mitchell's trial. 792 So.2d at 216.

¶61.    At McGowen's trial, defense counsel objected during direct examination of Dr. McGarry as the State began to introduce and question Dr. McGarry about photographs of the mallet and of Shelby's head. The following exchange took place with the jury out:

| | |
|---|---|
| BY DEFENSE COUNSEL: | We object to any foreign object that's shown in these photographs. Not that one, that one. |
| BY THE COURT: | What is that? |
| BY THE STATE: | It's a mallet. |
| BY DEFENSE COUNSEL: | I need to make a record outside the presence of the jury. |
| | (Jury is dismissed) |
| | ****** |
| BY DEFENSE COUNSEL: | I have no objection to that one and I certainly have no objection to that one. There are four photographs. I has handed a total of six. There are four. And, while they may be gruesome in nature, the doctor said they would aid him in his testimony, so I think the Court would probably let those in. But I object to what appears to be an experiment that was conducted, by whom we know not, which are State's Exhibit -- premarked Exhibits 43, 44, 45, and 46. And I object to that. There's no evidence. |
| BY THE COURT: | These are not what he showed me. The one with the mallet -- he handed me those two. These are withdrawn or just I'm going to rule -- |
| BY THE STATE: | Well, I'm just not going to -- I won't offer them. |

26

| BY THE COURT: | Okay. We're down to those two. Those are Exhibit 45 and 46. Let's narrow it to those. |
|---|---|
| BY DEFENSE COUNSEL: | I want to object to those as well. Judge, the reason -- he's kind of getting the cart before the horse. But they did a -- they had a serologist look at this mallet. Found no blood, no hair, no tissue, no nothing on it. And, yet, they want to interject that this mallet is the murder weapon. That's pure speculation. |
| BY THE COURT: | Well, I need to hear what Dr. McGarry says about it, those two photographs. Those two photographs only. You don't need to go through everything he's going to say. |

The State and defense counsel were then given the opportunity to interview Dr. McGarry about what his testimony would be in regard to these two photographs (SE-45 and SE-46). During both interviews Dr. McGarry said he would testify that the mallet in the photograph was consistent with the injuries to Shelby's head, but it would be impossible to say the mallet was the murder weapon in fact because someone could have wiped the blood and tissue off of it before the serologist's examination. Following his interview of Dr. McGarry, defense counsel offered a general objection but did not ask for a continuance and did not specify a discovery violation.

¶62. Despite the defense counsel's failure to request the invocation of the *Box* procedure, the trial court followed it nonetheless. Defense counsel was given the opportunity to interview the witness and inspect the evidence outside the presence of the jury. After such an examination, *Box* places the burden on the defense to request a continuance. Failure to request a continuance constitutes a waiver of the discovery violation issue. *Harrison*, 635 So.2d at 898; *Box*, 437 So.2d 19, 22-26.

¶63. For the foregoing reasons, McGowen's second assignment of error is without merit.

### III. WHETHER THE TRIAL COURT VIOLATED McGOWEN'S CONSTITUTIONAL RIGHTS BY PERMITTING A CRIME LAB

**SEROLOGIST TO TESTIFY ABOUT EXAMINATIONS PERFORMED AND CONCLUSIONS REACHED BY A FORMER COWORKER AND SUPERVISEE WHO WAS ALSO A SCIENTIST AT THE CRIME LAB.**

¶64. McGowen's third assignment of error contends that his constitutional right to confront those who testify against him was violated when Amy Winters, a crime lab serologist, testified on behalf of her former coworker, Elizabeth Howell, as to the results of tests for blood and semen on various items in evidence. The Sixth Amendment to the United States Constitution and Article Three, §§ 14 and 26 of the Mississippi Constitution provide the accused with the right to confront those who testify against him. McGowen did not acquiesce to the substitution of Winters for Howell. McGowen argues Howell was available to testify, even though she was a law student in Jackson at the time of trial, if the State had only subpoenaed her.

¶65. McGowen analogizes his factual scenario to *Kettle v. State*, 641 So.2d 746 (Miss. 1994), and *Barnette v. State*, 481 So.2d 788 (Miss. 1985). In *Barnette*, the defendant was arrested for selling cocaine. 481 So. 2d at 789. At trial, the State introduced into evidence a certificate of analysis, certifying the substance Barnette was selling was indeed cocaine. *Id.* at 790. Because the analyst who tested the substance did not testify, Barnette objected and was overruled. *Id.* The State was acting pursuant to Miss. Code Ann. § 13-1-114 (now repealed), which then authorized such unaccompanied admission of records into evidence. On appeal, this Court agreed that the trial court committed error in admitting the certificate without the accompanying testimony of the analyst, but the Court stopped short of declaring the statute unconstitutional. *Id.* at 791. Instead, the Court construed the statute to require an analyst's testimony in narcotics cases when such a certificate is introduced unless the defendant provides pretrial consent, does not object during trial, and thereby waives his right under the confrontation clause. *Id.* at 792. However,

if the defendant makes a motion during trial, it must be granted and the analyst shall be required to testify.

*Id.*

¶66.    In *Kettle*, the defendant was also arrested for selling cocaine. 641 So.2d at 747. Before trial, he filed a motion in limine seeking to exclude testimony by a laboratory supervisor who did not himself perform the analyses forming the subject of his testimony. During the State's case-in-chief, the substance purchased from Kettle was introduced into evidence and testified about, not by the Mississippi Crime Lab analyst who examined the substance, but by the supervisor of the Crime Lab. *Id.* at 748. Kettle did not object, but on appeal relied on his pretrial motion in limine. *Id.* While this Court preferred Kettle to have objected during trial, it nonetheless found his pretrial motion preserved his constitutional right to confront witnesses testifying against him. *Id.* Following *Barnette*, *Kettle* held that it was a violation of a criminal defendant's Sixth Amendment confrontation right to allow someone other than the analyst who performed the laboratory examination to testify to the results in a narcotics case. *Id.* at 750.

¶67.    In *Adams v. State*, 794 So.2d 1049, 1057-58 (Miss. Ct. App. 2001), a sexual battery case, a similar assignment of error was raised on appeal averring that the defendant's Sixth Amendment confrontation right had been violated when a lab supervisor named Warren testified on behalf of his lab technician.. Adams relied on *Kettle* to assert this violation, but the Court of Appeals found "*Kettle* [did] not apply. . . because Warren supervised, witnessed and checked the tests performed by his technician. Warren is not so far removed from the process as to be reduced to the level of a records custodian." *Id.*

¶68.    This Court agrees with the Court of Appeals' understanding that *Barnette* and *Kettle* are limited to those instances in which the testifying witness is so far removed from the analysis as to be essentially a records custodian for the purposes of testifying at trial. *Id.* By contrast, when the testifying witness is a

29

court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights. Here, Winters was a court-accepted expert in the field of forensic serology. In her testimony, Winters explained how she participated in the analyses performed by Howell.

> MS. WINTERS: Every time an experienced analyst or a trained analyst that has been deemed certified to conduct independent analysis on a case, any time that an individual submits or performs examinations and then prepares to submit a report, those examinations have to be reviewed for technical content. And this is called a technical review. And basically what is done, and what I did in this case, is I received the work sheets that were generated by Ms. Howell documenting the examination she performed and a draft or rough copy of the report that she planned to submit... And it was my role to review her work sheets to determine if she did in fact perform all the tests that could be and were supposed to be performed for these types of examinations. And if she performed all the examinations she was supposed to, did she reach the proper or accurate conclusions in the report based on these examinations. And, once that is done, the final report is printed off and I initial and date that and then it is submitted to the submitting agency.

Winters was thus actively involved in the production of the report and had intimate knowledge of the analyses even though she did not perform the tests first hand.

¶69.    Furthermore, this particular expert testimony did not concern an essential element of the crime and was not damaging to McGowen's case. The testimony in question was essentially moot to the determination of the case. Winters testified that the tests for semen and blood on a comforter were negative, the tests for blood on the mallet were negative and the tests from the sexual assault kits for semen were negative. The only potentially damaging testimony Winters offered against McGowen was her comment that if digital penetration were the only sexual act performed on Shelby, then one would not expect to find semen. Unlike *Barnette* and *Kettle*, in which the challenged testimony concerned the "essential element [of the alleged

30

offense]," namely whether the substance sold was cocaine, here the challenged testimony plays no significant role in the ultimate outcome of the case. The trial court clearly did not err in allowing Winters's testimony; however, even assuming arguendo, that we were to find the trial court erred in allowing Winters's testimony, it would be harmless error beyond a reasonable doubt. McGowen's third assignment of error is thus without merit.

IV.    **WHETHER THE TRIAL COURT ERRED IN ALLOWING EXPERT TESTIMONY CONCERNING THE RESULTS OF HAIR SAMPLE COMPARISONS WITHOUT FIRST HOLDING A PRE-TRIAL "GATEKEEPING" HEARING ON THE CREDIBILITY AND ADMISSIBILITY OF SUCH EVIDENCE.**

¶70.    Citing a litany of academic abstracts, McGowen next argues that microscopic hair and fiber comparisons are not the probative evidence they once were esteemed to be, and that ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) has placed trial judges in the role of "gatekeeper" by bestowing them with the duty to keep dubious scientific testimony out of the courtroom. "In a post-***Daubert*** world," McGowen contends, "the trial court should have called for a hearing on the admissibility of hair comparison, especially when, as in Mr. McGowen's case, DNA testing was available...." Because no such hearing was held, McGowen argues, the trial court committed plain error and violated his due process and fair trial rights.

¶71.    Because of the status of the law in this State at the time of McGowen's trial, this claim is without merit. The learned trial judge correctly applied the law as it then existed. "This State has declined to adopt the ***Daubert*** test and continues to use the time-proven test set out in ***Frye v. United States***, 293 F. 1013, 1014 (D.C. Cir.1923)." ***Humphrey v. State***, 759 So.2d 368, 384 (Miss. 2000). *See also* ***Gleeton v. State***, 716 So.2d 1083, 1086 (Miss.1998). The ***Frye*** test merely requires a scientific procedure to "be sufficiently established to have gained general acceptance in the particular field in which

it belongs." 293 F. at 1014. *But cf. **Daubert***, 509 U.S. at 588-96 (requiring trial judges to ensure reliability of expert's testimony by examining methodology, checking peer reviewed publications, and, if necessary, looking to the general acceptance of the relevant scientific community).

¶72. Simply put, at the time of McGowen's trial, this Court had not adopted the ***Daubert*** rule. *But see* Amended Rule 702 of the Mississippi Rules of Evidence (effective May 29, 2003).[6] Moreover, hair and fiber comparisons have long been recognized in Mississippi courts. ***Manning v. State***, 726 So.2d 1152, 1180 (Miss. 1998), *overruled on other grounds by*, ***Weatherspoon v. State***, 732 So.2d 158 (Miss. 1999); ***Bevill v. State***, 556 So.2d 699, 707 (Miss. 1990); ***Slyter v. State***, 246 Miss. 402, 149 So.2d 489, 492 (1963).

## V. WHETHER THE TRIAL COURT ERRED IN ADMITTING STATE'S EXHIBIT 9, A GRUESOME PHOTOGRAPH.

¶73. Next, McGowen argues it was reversible error to admit into evidence a gruesome photograph of the victim, SE-9. McGowen says the photograph had no relevance to any witness' testimony and, therefore,

---

[6]The newly adopted Miss. R. Evid. 702, with the newly added language underlined, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Comment under the newly amended rule states in pertinent part:

> By the 2003 amendment of Rule 702, the Supreme Court clearly recognizes the gate keeping responsibility of the trial court to determine whether the expert testimony is relevant and reliable. This follows the 2000 adoption of a like amendment to Fed. R. Evid., 702 adopted in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579 (1993).

had no evidentiary value. Additionally, the State had already introduced two photographs of the victim, SE-7 and SE-8. The trial judge denied McGowen's motion in limine and subsequent objection to the introduction of the photograph thereby, according to McGowen, needlessly inflaming and prejudicing the jury. McGowen correctly states the standard of review for this assignment of error is abuse of discretion. *Ashley v. State*, 423 So.2d 1311, 1316 (Miss. 1982); *Hughes v. State*, 401 So.2d 1100 (Miss. 1981). McGowen then provides a string of cites to cases which caution trial judges to "consider carefully all the facts and circumstances surrounding admission of any photograph." *Mackbee v. State*, 575 So.2d 16, 30-32 (Miss. 1990); *Welch v. State*, 566 So.2d 860 (Miss. 1990); *McNeal v. State*, 551 So.2d 151 (Miss. 1989); *Stringer v. State*, 500 So.2d 928 (Miss. 1986).

¶74.     In this state a trial judge is granted broad discretion in admitting photographs. *Ashley v. State*, 423 So.2d at 1316 (citing *Briggins v. State,* 416 So.2d 691 (Miss. 1982)). As long as photographs "supplement or add clarity to the testimony" no abuse of discretion is found. *Id.* (citing *Hughes v. State,* 401 So.2d at 1106 (affirming trial court's admittance of photographs of rape victim's arms fifteen days after the incident because the photographs supplemented and provided clarity to the testimony of a witness)).

¶75.     In *Mackbee*, the defendant, convicted of capital murder, argued on appeal, inter alia, that an autopsy photograph of the victim's neck should not have been admitted into evidence or shown to the jury. 575 So.2d at 32. The color photograph depicted the victim's neck severed by the medical examiner in order to display the soot lining the victim's esophagus. Because this evidence corroborated the State's theory that the victim was knocked unconscious and then burned to death in the trunk of a car, this Court held the photograph was more probative than prejudicial; and therefore admitting it into evidence was not an abuse of the trial judge's discretion. *Id.*

¶76. At McGowen's trial, defense counsel's objection to the photograph was vague, but evidently was grounded on an objection to the fact that the witness, Investigator Rodney Fountain, did not actually take the photograph. State's exhibit 9 portrays Shelby's body as it appeared in the woods where investigators found her. As such the photograph corroborated the testimony of Investigator Fountain and other State's witnesses and added to the jury's understanding of the events leading to and surrounding Shelby's death. State's exhibit 9 therefore is more probative than prejudicial. *Cf. **Mackbee***, 575 So.2d at 32 (finding gruesome photograph of murder victim's neck more probative than prejudicial when it corroborated state witnesses' testimony and added to the jury's understanding of the events surrounding the crime). For these reasons, this Court finds the trial court did not abuse its discretion in admitting SE-9 into evidence.

## VI. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GIVING A JURY INSTRUCTION ON THE DEFENSE OF INTOXICATION WHEN McGOWEN DID NOT PRESENT A DEFENSE OF INTOXICATION.

¶77. McGowen's next assignment of error asserts that the trial court should not have granted a jury instruction on intoxication (S-4A) because McGowen did not offer an intoxication defense, voluntary or involuntary, and objected to an intoxication defense instruction at trial. McGowen further claims that there was no evidentiary basis for such an instruction and that the prosecution's proffer of this instruction constituted a breach of duty to ensure the protection of a defendant's constitutional and statutory rights.

¶78. The instruction given at trial reads in full:

> The Court instructs the jury that if a Defendant, when sober, is capable of distinguishing between right and wrong, and the Defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated by use of alcohol and commits an offense while in that condition, he is criminally responsible for such acts. Therefore, if you find from the evidence in this case beyond a reasonable doubt that the Defendant, Hugh Wilton McGowen, Jr., was capable of distinguishing between right and wrong at the time of the alleged offense and that he voluntarily deprived himself of the ability to distinguish between right and wrong by becoming intoxicated by use of alcohol

34

and while in that condition committed the offense of Capital Murder, then he is criminally responsible for that act, and in such event you should find the Defendant guilty as charged.

¶79.     In support of his first assertion that the trial court erred in allowing this instruction, McGowen relies on *Taylor v. State*, 597 So.2d 192 (Miss. 1992), the defendant's murder conviction was reversed due to an improper jury instruction. Taylor's former girlfriend was killed after she came to his home, argued with him, pulled out a gun from under his couch, and was shot when she and Taylor struggled over the gun. *Id.* at 192-93. Throughout the trial, Taylor maintained her death was an accident. *Id.* While the trial court correctly granted Taylor's requested jury instruction setting out his accident theory, the trial court went further and granted the State's requested jury instruction requiring the jury to find Taylor guilty of murder, "unless the Jury entertain[ed] a reasonable doubt as to whether or not the killing was done in necessary self defense." *Id.* at 194. This Court pointed out in *Taylor* that the granting of the State's proffered jury instruction on self defense was error because "Taylor made no claim of self-defense. No one offered evidence of self-defense. Taylor's theory of defense throughout was one of accident or excusable homicide." *Id.* We also held that this instruction deflected the attention of the jury from Taylor's theory of accident toward the theory of self-defense which was never mentioned during the trial. *Id.* at 194. "One cannot read the instruction without forming the opinion that the principal defense to be considered is self-defense." *Id.* The Court went on to explain its reasoning. "Where, as here, the evidence is somewhat circumstantial and inconclusive, and where the Court has substantially instructed the jury that it consider a matter extraneous to the process, the risk of a misdirected verdict becomes intolerably high." *Id.* at 195.

¶80.     In a subsequent case, the Court of Appeals distinguished *Taylor* as being primarily concerned with whether a given jury instruction would confuse the jury. *Hester v. State*, 841 So.2d 158, 161 (Miss. Ct. App. 2002). Hester was on trial for murder and asserted that he acted in self-defense when he shot the

victim four times during an altercation. The State sought and received from the trial court a jury instruction which offered the jury the option of finding Hester guilty of the lesser offense of manslaughter as opposed to murder. After being convicted of murder, Hester alleged on appeal that the trial court had erred in granting the State's request for a manslaughter instruction because that instruction negated his self-defense theory. *Id.* at 160. The Court of Appeals did not find a risk of confusion sufficient to warrant reversal. *Id.* at 161. "Whether Hester was completely exonerated because of a legitimate threat to him, or whether his reaction to events was still criminal but lessened by the heat-of-passion, are not self-cancelling in the manner of the precedents [including *Taylor*]." *Id.*

¶81.    This Court similarly views the inclusion of an intoxication instruction as not self-cancelling McGowen's proposed defense of total innocence. Before convicting McGowen, the jury had to ascertain for themselves beyond a reasonable doubt that he committed the act of killing Shelby. This determination had little to do with whether Hugh McGowen was intoxicated on the night of February 26, 2000. The jury's consideration of McGowen's inebriation would only come into play once the jury decided he in fact killed the victim. McGowen meanwhile maintained no partial defense, but rather total innocence, claiming his brother Charles committed the crime. The intoxication instruction did not present a high risk of confusing the jury or diverting the jury's attention from McGowen's proposed defense of complete innocence. Additionally, the jury instruction did not lessen the jury's responsibility in determining McGowen's guilt or innocence from the evidence and the law, but instead appropriately informed the jury that McGowen's criminal culpability was not otherwise lessened because of his voluntary intoxication.

¶82.    McGowen's second contention in his sixth assignment of error is that prosecution's proffer of the intoxication instruction constituted a breach of duty to ensure the protection of a defendant's constitutional

36

and statutory rights. Because we have determined none of McGowen's constitutional or statutory rights were abrogated, there could not have been a breach of duty by the prosecutor to ensure such rights.

¶83.    In conclusion, we find the trial court did not abuse its discretion in allowing the intoxication defense instruction. Likewise, the prosecutor did not breach any duty to ensure the defendant's constitutional or statutory rights. Therefore, this assignment of error is without merit.

### VII.    WHETHER THE TRIAL COURT ERRED IN PERMITTING THE VICTIM'S MOTHER TO OPINE THAT McGOWEN HAD KILLED HER DAUGHTER.

¶84.    McGowen next argues that Miss. R. Evid. 701 was violated when Shelby's mother, Miranda Tucker Tames, was permitted to testify that she believed Hugh McGowen murdered Shelby. According to McGowen, this testimony had no probative value, but was highly prejudicial. The text of Rule 701 reads in full:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.[7]

The comment to Miss. R. Evid. 701 explains that the old traditional rule was to exclude lay opinions from evidence. By contrast the comment explains, "Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met." Miss. R. Evid. 701 cmt. The first consideration is whether the opinion is based on first hand knowledge or observation. The second is whether the opinion is helpful to the issue being determined.

---

[7]Again, this the Rule is quoted as it existed at the time of McGowen's trial. Effective May 29, 2003, Rule 701 was amended in such a way that Rule 701 (a) and (b) above remain intact with the exception of the addition of gender-neutral language, and there was added the language "and, (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶85.    In the instant case, McGowen assigns error based on the testimony of Shelby's mother, Miranda Tucker Tames, during cross-examination. To place this testimony in context, during defense counsel's cross-examination of Tames, she was asked whether she mailed a letter to Hugh McGowen while he was in jail and whether she "file[d] a lawsuit against Hugh McGowen for the wrongful death of your daughter for five million dollars?" Her responses indicated she had indeed done both. Immediately following cross-examination, the prosecution on redirect asked Miranda Tucker Tames why she mailed the defendant the letter. The following exchange occurred:

Q.      Miranda, why did you send the defendant that letter?

A.      I was hurt.

Q.      And why were you hurt?

A.      My daughter was dead.

Q.      And who do you think is responsible for that?

BY DEFENSE COUNSEL:     We object to what she thinks.

BY THE PROSECUTION:     Well, Your Honor, I think it goes to why -- to her state of mind as to why she wrote the letter, which the defendant introduced into evidence.

BY THE COURT:           Overruled.

BY DEFENSE COUNSEL:     She didn't have a thing in the world to base it on.

BY THE COURT:           It may well be, but the State is trying to get at why she wrote the letter. What she believed is certainly relevant to why she wrote the letter. Overruled.

BY THE WITNESS (continuing):

A.      Would you repeat that.

38

Q. Why did you write that letter to Hugh McGowen, Jr.?

BY DEFENSE COUNSEL: Again, we object.

BY THE COURT: Overruled.

BY THE PROSECUTION (continuing):

Q. You can answer.

A. Because I was hurt.

Q. And why were you hurt.

A. Because I believed he murdered my daughter.

¶86. "Rule 701 does not open the door to any and all opinion testimony." *Jackson v. State*, 551 So.2d 132, 144-45 (Miss. 1989) As this Court stated in *Whittington v. State*, 523 So.2d 966 (Miss. 1988), a lay witness may not express his or her opinion on the ultimate issue being determined in a case. Nor may a witness give an opinion that is not based upon his personal perceptions, or that will not help the jury fairly resolve a contested material fact. *Id.* (citing *Dale v. Bridges*, 507 So.2d 375, 378 (Miss.1987)).

¶87. However, in *Jackson*, this Court rejected the defendant's claim that the trial court erred by allowing two testifying investigators to express their opinions as to the defendant's guilt and to list incriminating factors. *Id.* at 144. The trial court allowed the officers to give such testimony in part "because the defense had 'opened the door' on cross-examination to this line of questioning." *Id.* at 144. In view of the nature of the cross-examination, this Court found the trial court was "within its discretionary authority in allowing the disputed redirect." *Id.* This Court concluded, "In no event may we sensibly conclude that this redirect substantially violated Jackson's right to a fair trial." *Id.* at 144-45 (citing Miss. R. Evid. 103(a); *Ponthieux v. State*, 532 So.2d 1239, 1248 (Miss.1988)).

39

¶88.    As in *Jackson*, McGowen's defense counsel "opened the door" to the line of questioning that led to Miranda Tucker Tames's testimony that she believed McGowen killed her daughter. Defense counsel introduced the letter written by Tames to McGowen, of which the prosecution was previously unaware, and began asking her about it. On redirect, the prosecution only asked her why she wrote the letter and why she was feeling hurt when she wrote it. In her response, Tames only discussed her perceptions and feelings when she wrote the letter. As in *Jackson*, this Court cannot sensibly conclude that this redirect substantially violated McGowen's right to a fair trial. *Id.*

¶89.    Furthermore, an examination of Miss. R. Evid. 701 and its Comment supports the conclusion that McGowen's final assignment of error should be denied. In accordance with Miss. R. Evid. 701, Tames's testimony was (a) rationally based on her perception of her feelings and beliefs at the time she wrote the letter; and (b) helpful to the clear understanding of her testimony, namely what motivated her to write the letter to McGowen. Given the satisfaction of these two requirements, plus the clear intent of Rule 701 articulated in its comment – that it "is a departure from the traditional rule" and that it "favors admission of lay opinions" – the trial court did not abuse its discretion in allowing Tames to testify as to her motivation for writing the letter to McGowen. McGowen's seventh assignment of error is without merit.

## PRO SE ISSUE

### VIII.    WHETHER THE STATE COMMITTED PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS.

¶90.    McGowen argues in his pro se supplemental brief that the State improperly misrepresented facts and evidence during closing arguments. McGowen's main contention concerns whether there was a light on a utility pole located twenty-five feet from where Shelby's body was found. During McGowen's testimony, he stated that it was "pitch black" and he could not see anything when he and his brother left Shelby's body

40

in the woods. However, during closing arguments, the State deduced that it was not dark because there would have been light from the utility pole located only twenty-five feet away. McGowen argues he was not allowed a chance to investigate this new evidence because it was presented during the State's rebuttal closing argument. McGowen also contends the State was asking the jury to infer that McGowen lied about it being dark when Shelby's body was left in the woods.

¶91.    The standard of review which this Court must apply to prosecutorial misconduct during closing arguments is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard v. State*, 777 So.2d 659, 661 (Miss. 2001) (citing *Ormond v. State*, 599 So.2d 951, 961 (Miss. 1992)). *See also Flowers v. State*, 842 So.2d 531, 553 (Miss. 2003). The purpose of a closing argument is to fairly sum up the evidence. *Rodgers v. State*, 796 So.2d 1022, 1027 (Miss. 2001).

> "The prosecutor may comment upon any facts introduced into evidence, and he may draw whatever deductions and inferences that seem proper to him from the facts." *Bell v. State*, 725 So.2d 836, 851 (Miss.1998) (collecting authorities). Counsel "cannot, however, state facts which are not in evidence, and which the court does not judicially know, in aid of his evidence. Neither can he appeal to the prejudices of men by injecting prejudices not contained in some source of the evidence."*Nelms & Blum Co. v. Fink*, 159 Miss. 372, 131 So. 817, 821 (1930). *See also Sheppard*, 777 So.2d at 661.

*Flowers*, 842 So.2d at 554. In discussing the broad latitude afforded attorneys in making their closing arguments, this Court has stated:

> Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.

*Brown v. State*, 690 So.2d 276, 296 (Miss. 1996) (quoting *Johnson v. State*, 416 So.2d 383, 391 (Miss. 1982)). If the argument does not result in "unjust prejudice against the accused as to result in a decision influenced by the prejudice so created," it will be deemed harmless. *Wells v. State*, 698 So.2d 497, 507 (Miss. 1997) (quoting *Davis v. State*, 684 So.2d 643, 656 (Miss. 1996); *Davis v. State*, 530 So.2d 694, 701 (Miss. 1988)).

¶92.     This assignment of error is without merit. The State simply logically deduced from the evidence that there was a light on the utility pole. This logically drawn conclusion based upon evidence found in the record did not unjustly prejudice McGowen.

## CONCLUSION

¶93.     We have meticulously studied the record in this case and the applicable law in light of McGowen's numerous assignments of error. Having done so, we find no error and thus affirm the Jackson County Circuit Court's judgment of conviction for capital murder and sentence of life imprisonment without parole.

¶94.     **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITHOUT PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, EASLEY AND GRAVES, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**