# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01456-COA

**VANESSA LYNN PAGE A/K/A VANESSA L.**                **APPELLANT**
**PAGE A/K/A VANESSA PAGE**

**v.**

**STATE OF MISSISSIPPI**                                         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/13/2016 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED: 02/27/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. After a bench trial, Vanessa Lynn Page was convicted of felony driving under the influence (DUI). Page appeals. Finding no error, we affirm.

FACTS

¶2. On August 14, 2015, around 7:00 p.m., Page was arrested near her home in Cedar Lake trailer park in Biloxi, Mississippi, after a tipster identified by first and last name called 911 and reported Page. The tipster called 911 shortly after the tipster and Page left the same Alcoholics Anonymous (AA) meeting. The tipster expressed concern for Page's driving, and

the tipster included specific details about Page's identity, vehicle, and destination. The tipster also told the dispatcher that someone had offered Page a ride home, but Page refused. The tipster described Page as a slightly belligerent and extremely intoxicated white woman who was approximately five-feet tall with her hair pulled back into a ponytail.

¶3. Biloxi Police Officer Robert McKeithen received the call from dispatch. McKeithen was familiar with the trailer park where Page lived.

¶4. When McKeithen approached the area of the trailer park, he immediately noticed the described car at an intersection in front of him. As he made a turn onto South Cedar Lake, he saw Page's grey Nissan Versa turn left into the trailer park. He later testified that the driver matched the description originally provided in the tip. McKeithen followed Page for about an eighth of a mile before pulling her over. Traveling at ten miles an hour, McKeithen trailed Page for roughly forty-five seconds before he stopped her. McKeithen testified he did not observe any traffic offenses while he followed Page. He made the stop based on the confirmation of information he received from dispatch and also for the safety of the children in the area.

¶5. Page pulled over immediately. When McKeithen approached, he noticed that Page smelled like alcohol, her eyes were glassy, and her speech was slurred. Once she got out of the car, Page had trouble keeping her balance and she was unsteady on her feet. McKeithen ran her driver's license, which came back as suspended because of a prior DUI from earlier that year.

¶6. Shortly after McKeithen stopped Page, Officer Jason Cummings, a DUI officer,

arrived on the scene and took over to administer field sobriety tests. Cummings noticed the same odor, appearance, and slurred speech that McKeithen observed. When Cummings attempted to administer the field sobriety tests, Page failed the first test. Citing a pre-existing injury, Page was physically unable to complete the remainder of the tests. Based on these observations, Cummings arrested Page for driving with a suspended license. After he properly Mirandized her, he took her to the police station to continue the DUI investigation.

¶7. At the station, Page agreed to an Intoxilyzer test, but she was unable to provide a sufficient breath sample. Page then verbally consented to provide a blood sample. She was taken to Merit Health Hospital, where she gave written consent in the presence of an officer and the phlebotomist who proceeded to draw her blood.

¶8. The blood samples were sent to the crime lab for testing. The results indicated that Page had a blood-alcohol concentration of 0.19 percent. Thomas Graham, a crime lab analyst, conducted the test and prepared the report, which was then reviewed by the lab's technical reviewer, Maury Phillips. At trial, Phillips testified regarding Graham's findings. Phillips also described the standard process of analyzing blood samples, and the roles of a technical reviewer. Phillips explained that he personally reviewed Graham's work and all data generated by the testing. Once Phillips verified the results, he signed Graham's report. According to Phillips, the results would have been the same had he conducted the tests himself. The prosecution never entered the report into evidence.

¶9. However, the prosecution submitted evidence that Page had two previous DUI convictions within five years of the present case. The circuit court found Page guilty of

felony DUI and sentenced her to five years in the custody of the Mississippi Department of Corrections, with three years suspended and two to serve, followed by three years of post-release supervision.

ANALYSIS

I.      *Whether there was reasonable suspicion for an investigatory stop.*

¶10.    "This Court applies a mixed standard of review when considering Fourth-Amendment issues." *Cook v. State*, 159 So. 3d 534, 537 (¶6) (Miss. 2015) (citing *Eaddy v. State*, 63 So. 3d 1209, 1212 (¶11) (Miss. 2011)). "We apply de novo review when determining whether probable cause or reasonable suspicion exists." *Id.* "[D]e novo review is limited to the trial court's decision based on historical facts reviewed under the substantial evidence and clearly erroneous standards." *Id.* (quoting *Dies v. State*, 926 So. 2d 910, 917 (¶20) (Miss. 2006)).

¶11.    Police officers may conduct a brief investigatory stop when they have "reasonable suspicion, grounded in specific and articulable facts that allows the officers to conclude [that] the suspect is wanted in connection with criminal behavior." *Eaddy*, 63 So. 3d at 1213 (¶14) (quoting *Walker v. State*, 881 So. 2d 820, 826 (¶10) (Miss. 2004)). "[A]n informant's tip may provide reasonable suspicion if [it is] accompanied by some indication of reliability; for example, reliability may be shown from the officer's independent investigation of the informant's information." *Id.* at (¶15) (citing *Florida v. J.L.,* 529 U.S. 266, 270 (2000)). "Reasonable suspicion is dependant upon both the content of the information possessed by the detaining officer as well as its degree of reliability." *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 118 (¶30) (Miss. 1999) (citing *Alabama v. White*, 496 U.S. 325, 330 (1990)).

4

"Both factors—quantity and quality—are considered in the 'totality of the circumstances.'"

*Id.*

¶12. The Mississippi Supreme Court has addressed reasonable suspicion in DUI cases in *Floyd* and *Cook*. In *Floyd*, 749 So. 2d at 112 (¶ 4), an off-duty police officer received a tip from someone who had provided the officer with credible information in the past. That information was relayed to an on-duty officer who located the car and pulled over the driver without observing a traffic violation. *Id.* at (¶5). The driver evidenced signs of intoxication, and he had an open liquor bottle. *Id.* at (¶¶6-7). Because of the accuracy of the informant's tip, the off-duty officer's familiarity with the informant, and the fact that there was no reason "to doubt the reliability or good faith of the informant," the supreme court found that the investigatory stop was justified. *Id.* at 119 (¶33).

¶13. Page argues that unlike the informant in *Floyd*, the tipster was essentially anonymous because the tipster had no prior working relationship with the Biloxi Police Department. However, there is no requirement that a tipster provide credible information in the past to be able to do so in the present. If that were the case, a first-time tipster could never establish credibility. Instead, as noted previously, the court takes a totality-of-the-circumstances approach when evaluating a tip and the tip's subsequent establishment of reasonable suspicion. *Alabama*, 496 U.S. at 330.

¶14. In *Cook*, a driver was pulled over and arrested for DUI after a police officer followed the driver based on a tip from an unknown source who said Cook had been driving erratically. *Cook*, 159 So. 3d at 536 (¶3). The arresting officer never observed that behavior

before stopping the driver. *Id.* at 540 (¶16). Ultimately, the supreme court reversed the DUI conviction because the officers did not corroborate the criminal activity reported in the tip prior to stopping the driver. *Id.* at (¶18). An accurate description of the driver's vehicle and location was insufficient. *Id.* at (¶17).

¶15.    Page relies on *State v. Sailo*, 910 S.W.2d 184, 188 (Tex. Ct. App. 1995), in which the Texas Court of Appeals noted that "a tip by an unnamed informant of undisclosed reliability standing alone will rarely establish the requisite level of suspicion necessary to justify investigative detention." However, that is not what occurred in the present case. Here the tipster identified herself by name and reported that she had personally witnessed Page's behavior during an AA meeting just prior to calling in the tip. The tipster also provided specific facts regarding Page's car, physical appearance, and destination. McKeithen stopped Page based on his confirmation of those facts. The content of the tip was extremely specific and easily and visibly verifiable by McKeithen before he stopped Page. The fact that the tipster had been participating in the same AA meeting as Page and personally witnessed Page's behavior, speaks to the tip's reliability regardless of whether the tipster had provided credible information to the police in the past. The "quantity and the quality" of the information provided in the tip, when considered alongside the totality of the circumstances, was enough to establish reasonable suspicion. See *Floyd,* 749 So. 2d at 118 (¶30). Therefore, the investigatory stop did not violate Page's Fourth Amendment rights. We find no merit to this issue.

II.    *Whether the admission of the blood-alcohol testing violated Page's Confrontation Clause rights.*

¶16.    "The standard of review for admission of evidence is abuse of discretion." *Debrow v. State*, 972 So. 2d 550, 552 (¶6) (Miss. 2007) (citing *Smith v. State*, 839 So. 2d 489, 494 (¶6) (Miss. 2003)).  "However, when a question of law is raised, the applicable standard of review is de novo." *Id.*

¶17.    Criminal defendants have a constitutional right to confront witnesses against them. U.S. Const. amend. VI; Miss. Const. art. 3, § 26.  This applies to in-court testimony and out-of-court testimonial hearsay, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him.  *Rubenstein v. State,* 941 So. 2d 735, 754 (¶6) (Miss. 2006) (citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)).

¶18.    Here, Graham performed the test that determined Page's 0.19 percent blood-alcohol concentration.  At the time of Page's trial, Graham was no longer employed by the crime lab, and he did not live in Mississippi.  The prosecution called Phillips to testify regarding the test results.  Although Graham's lab report was not entered into evidence,  Phillips testified regarding the results.  Accepted by the trial court as an expert in forensic toxicology, Phillips explained that he did not perform the test on Page's blood sample.  But he clarified that as the section chief for the toxicology and implied-consent sections of the Mississippi Forensics Lab, he was the technical reviewer of Graham's test.

¶19.    Claiming that the trial court erred by allowing Phillips's testimony, Page relies heavily on the outcome of *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 308 (2009).  There, the prosecution attempted to circumvent the Confrontation Clause requirement by submitting analysts' affidavits and "certificates of analysis" instead of live, in-court testimony. *Id.*  The

United States Supreme Court held that the Sixth Amendment does not permit prosecutors to submit forensic reports absent a defendant's opportunity to cross-examine the analysts who generated those reports. *Id.* at 329.

¶20. Page also relies on *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011). There, the Supreme Court rejected the use of an uninvolved surrogate witness to testify about forensic reports. *Id.* At trial, the prosecution sought to admit the crime laboratory's report, which showed that Bullcoming was intoxicated. *Id.* at 655. The prosecution did not, however, call as a witness anyone involved with the blood-alcohol concentration test and its subsequently generated report. *Id.* at 653. Instead, the prosecution attempted to call another analyst from the crime laboratory. *Id.* at 655. That analyst "had neither observed nor reviewed" the work of the analyst who had tested Bullcoming's blood sample. *Id.* The Supreme Court ruled that allowing testimony by uninvolved parties about the forensic reports, as well as entering those reports into evidence without subjecting the analysts to cross-examination, would be reversible error. *Id.* at 657-58.

¶21. Such is not the case here. Phillips was the technical reviewer of the lab report at issue, and he testified. The supreme court has held that a supervisor, reviewer, or other analyst may testify in lieu of the primary analyst where the surrogate witness was "actively involved in the production of the report and had intimate knowledge of the analyses even though [he] did not perform the tests first hand." *McGowen v. State*, 859 So. 2d 320, 340 (¶68) (Miss. 2003). Additionally, "when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then

8

the testifying witness's testimony does not violate a defendant's Sixth Amendment rights." *Id*. at 339 (¶68).

¶22. Here, Phillips was a court-accepted expert in the field of forensic toxicology. He was actively involved in the production of the report, he had intimate knowledge of the tests that were performed and the process that was used to confirm the findings, and he reviewed Graham's work to ensure that the conclusions were correct and accurate. Phillips testified that when an analyst has completed the analysis, his work packet is submitted for review. Phillips explained that all reports issued by an analyst must be technically and administratively reviewed before they are released. As the technical and administrative reviewer in this case, Phillips verified that Graham followed protocol and used the proper scientific methods of toxicology. Moreover, Phillips stated that he received Graham's work packet "with all of the data" and examined it to ensure that the policies were followed and that Graham's conclusions were accurate and correct.

¶23. This case is consistent with *Jenkins v. State*, 102 So. 3d 1063, 1069 (¶20) (Miss. 2012), and *Grim v. State,* 102 So. 3d 1073, 1081 (¶23) (Miss. 2012), which both support the conclusion that Phillips's testimony did not violate Page's right of confrontation. In both cases, technical reviewers who had reviewed data generated by testing, verified the results, and signed the lab reports were called to testify as to their opinions on the forensic findings. *Jenkins*, 102 So. 3d at 1064 (¶1); *Grim*, 102 So. 3d at 1075 (¶1). Our supreme court held that the testimony of an analyst who did not perform the test did not infringe the defendant's right to confrontation if the testifying analyst had "intimate knowledge" of the analysis and if the

9

testifying analyst was "actively involved in the production" of the report at issue. *Jenkins,* 102 So. 3d at 1067, 1069 (¶¶13, 19); *Grim,* 102 So. 3d at 1079, 1081 (¶¶16, 20) (quoting *McGowen,* 859 So. 2d at 340 (¶13)).

¶24.     While Phillips did not conduct the test himself, he was "actively involved in the production of the report and had intimate knowledge of the analyses even though [he] did not perform the tests first hand." *See McGowen,* 859 So. 2d at 340 (¶68).  Additionally, Phillips testified that he would have come up with the same result had he done the testing himself. Therefore, we find that Phillips, as the technical and administrative reviewer, was qualified to testify as a surrogate witness in lieu of the primary analyst.  We find no merit to this issue.

¶25.     **AFFIRMED**.

        **LEE, C.J., IRVING, P.J., BARNES, CARLTON, FAIR, WILSON, GREENLEE, WESTBROOKS AND TINDELL, JJ., CONCUR.**