# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-KA-01855-SCT

**TOMMIE QUEEN a/k/a TOMMY QUEEN a/k/a TOMMIE LEE QUEEN**

*v.*

**STATE OF MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/12/2019 |
| TRIAL JUDGE: | HON. DEBRA W. BLACKWELL |
| TRIAL COURT ATTORNEYS: | RONNIE LEE HARPER |
| | TIM COTTON |
| | DAMON RAMON STEVENSON |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAMON RAMON STEVENSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BRITTNEY SHARAE EAKINS |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/30/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., COLEMAN AND BEAM, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Tommie Queen was convicted of three counts of dog fighting in violation of Mississippi Code Section 97-41-19 (Rev. 2014). Queen now appeals and argues that the trial court erred by admitting expert testimony, that there was not a sufficient evidentiary basis to support his convictions, and that the trial judge erred by not recusing. Finding no error, we affirm Queen's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     On the night of November 6, 2017, the Adams County Sheriff's Office received a call in reference to dogs barking and possible dog fighting. Deputy Thomas McGinty was dispatched to the address indicated, 29 1/2 Miracle Road, Adams County, Mississippi. Deputy McGinty was unsuccessful at establishing contact with anybody at the residence. When he walked to the back of the house, he observed multiple dogs that were on chains and a few that were not. Deputy McGinty testified that multiple dogs were fighting during the time that he was on the property. Deputy McGinty made contact with a neighbor and determined that Queen owned 29 1/2 Miracle Road.

¶3.     Deputy Stephen Karabelen was stationed at 29 1/2 Miracle Road on the night of November 6 to preserve the integrity of the property until daylight, when a search warrant could be obtained. He testified that 29 1/2 Miracle Road was located at the dead-end of a cul-de-sac. At approximately three o'clock in the morning, Deputy Karabelen noticed a vehicle driving down Miracle Road. He testified that when the vehicle's driver saw his unit, the driver pulled into 29 1/2 Miracle Road and then backed out. Deputy Karabelen flagged down the vehicle and determined that the driver was Queen's girlfriend, Tasia Martin. Martin confirmed that Queen was the owner of the property and stated that she was there to feed the dogs. Martin stated that she would take care of the animals on the property when Queen was out of town.

2

¶4. After a search warrant was obtained, numerous items, including heavy logging chains, bite sticks, intravenous (IV) bags containing saline, medicine bottles, vials of vitamins, muscle milk and other muscle-building items, several scales, and a treadmill, were seized from the property. Approximately five or six badly injured dogs were taken to a veterinarian, Dr. Robert Savant, and were humanely euthanized. Dr. Savant visited the property the next day and euthanized three more dogs that were seriously injured.

¶5. An Adams County grand jury indicted Queen for nine counts of dog fighting in violation of Mississippi Code Section 97-41-19. Queen was found guilty of counts VII, VIII, and IX and was sentenced to three years on each count to run consecutively.

¶6. Queen now appeals and raises three issues:

I. Whether the trial court erred by tendering Kyle Held as an expert in the field of animal cruelty and dog fighting.

II. Whether the State presented sufficient evidence to convict Queen of dog fighting.

III. Whether the trial court erred by denying Queen's motion to recuse.

**ANALYSIS**

**I. Whether the trial court erred by tendering Kyle Held as an expert in the field of animal cruelty and dog fighting.**

¶7. The determination that an expert is qualified in his field "is left to the sound discretion of the trial court." ***Poirrier v. Degrande***, 604 So. 2d 268, 270 (Miss. 1992) (citing ***Miller ex rel. Miller v. Stiglet, Inc.***, 523 So. 2d 55, 58 (Miss. 1988)). Thus, "[t]he standard of review for the admission or exclusion of evidence, such as expert testimony, is abuse of discretion."

3

*Thompson v. Holliman*, 283 So. 3d 718, 721 (Miss. 2019) (citing *Inv'r Res. Servs., Inc. v. Cato*, 15 So. 3d 412, 416 (Miss. 2009)).

### A. Expert Qualification

¶8. A witness may be qualified "an as expert by knowledge, skill, experience, training, or education . . . ." MRE 702. The trial court accepted Kyle Held as an expert in the areas of organized dog fighting and animal cruelty. Queen argues that the trial court erred by tendering Held as an expert witness. Queen's contention is without merit.

¶9. Held had been employed for approximately ten years by the American Society for the Prevention of Cruelty to Animals (ASPCA) as a regional director of investigation. Held stated that he "respond[ed] to local jurisdictions to help them with animal cruelty cases that they need assistance with due to capacity, education or experience." Prior to his job with ASPCA, Held worked as a statewide investigator for the humane society in Missouri. Held was in that position for eleven years and testified that his responsibilities were much the same as his current job but on the statewide level. Held testified that he was not required to have any certifications to be an animal investigator. However, he stated that his current position as the regional director of investigation required "a considerable amount of education and training."

¶10. Held was nationally certified by the National Animal Control Association. The NACA was not a government organization but was a "group of people who got together and have an organization . . . ." Held admitted that the certification did not have any relevance to

4

people outside of the organization and that he did not have a specific certification from the state of Mississippi.

¶11. Held had approximately "600 hours of specialized training in animal cruelty, which includes animal fighting, puppy mills, hoarding, several other areas." He had also been an instructor for most of his career in both agencies. Held stated that he was a nationally certified animal-cruelty officer and worked through the Law Enforcement Training Institute of the University of Missouri. Held also was an instructor at the Law Enforcement Training Institute. Additionally, Held had attended ten forty-hour training sessions at the University of Florida and the University of Colorado, and each training session had contained around fifteen hours of training solely dedicated to dog fighting.

¶12. Held stated that he had investigated dog-fighting cases "probably a few hundred" times over his career. Held had been "the lead investigator on the Missouri 500 which was an 18-month investigation which turned out to be the largest organized dog fighting seizure in history." In that role, Held went

> out every weekend, assist[ed] the undercover officers in whatever duties may be necessary at that time, whether it be medical evaluations of the dogs, also to help transport the animals after the [f]ights for evaluations, whether that be behavior evaluations or taken to a veterinarian and euthanized and used for necropsy, which is an autopsy for animals and that's collected as evidence.

¶13. Moreover, Held had testified in approximately one hundred animal-cruelty or animal-fighting cases and had been qualified as an expert around ten times overall and six times specifically in animal fighting. He had been qualified as an expert in Iowa two weeks before

5

this trial in the field of animal cruelty. However, Held had not been certified as an expert in dog fighting since 2013. Held stated that he had not testified as an expert in federal court. Held also testified that he had a technical certification from a technical college and had attended three years of college but did not hold any degrees. He also previously had owned a horse boarding stable and had worked as a veterinary assistant.

¶14. Queen argues that the trial court erred by tendering Held as an expert witness because he did not hold any college degrees, and Held testified that his previous job as an animal-cruelty investigator did not require any type of certification. However, a college degree is not a prerequisite for expert qualification. As previously stated, Mississippi Rule of Evidence 702 states that, in addition to education, an expert may be qualified through knowledge, skill, experience, or training. MRE 702. Held had been employed as an animal-cruelty investigator for more than twenty years, during which he assisted law enforcement with animal-cruelty cases. Held also had approximately "600 hours of specialized training in animal cruelty" and had been an instructor for most of his career in both agencies.

¶15. Queen's contention that Held did not know how many hours of training he had specifically in the field of dog fighting lacks merit. Held stated that he had attended ten forty-hour training sessions at the University of Florida and the University of Colorado and that each training session had contained around fifteen hours of training solely dedicated to dog fighting. Held additionally testified that he had investigated dog-fighting cases "probably a few hundred" times over his career. Held also had been the lead investigator in the Missouri

6

500, which was the largest organized dog-fighting seizure in history at that time. Queen's argument that Held's certification by the National Animal Control Association had no relevance also lacks merit.

¶16. Lastly, Queen takes issue with the fact that Held had never testified as an expert in federal court. Yet Queen failed to cite any authority stating that qualification as an expert in state court hinges on first being qualified as an expert in federal court. Accordingly, the trial court did not abuse its discretion by qualifying Held as an expert in the fields of dog fighting and animal cruelty based on his knowledge, skill, experience, and training.

### B. Expert Testimony

¶17. Queen next argues that the trial court erred by allowing Held to testify about opinions not contained in his expert report. Mississippi Rule of Evidence 702 provides that an expert may testify if

    **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    **(b)**    the testimony is based on sufficient facts or data;

    **(c)**    the testimony is a product of reliable principles and methods; and

    **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

MRE 702.

¶18. "This Court has adopted the United States Supreme Court's standard for judging the admissibility of expert testimony." ***Ill. Cent. R.R. Co. v. Brent***, 133 So. 3d 760, 781 (Miss.

7

2013); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)). It is the trial court's duty to "determine that the expert testimony is both relevant and reliable." *Union Carbide Corp. v. Nix*, 142 So. 3d 374, 388 (Miss. 2014) (citing *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 38 (Miss. 2003)). Expert testimony is necessary when a subject is "so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Id.* at 389 (internal quotation marks omitted) (quoting *Wyeth Lab'ys, Inc. v. Fortenberry*, 530 So. 2d 688, 692 (Miss. 1988)). The factors considered in a *Daubert* analysis are flexible and depend on the particular circumstances of the case. *Parvin v. State*, 113 So. 3d 1243, 1247 (Miss. 2013) (citing *McLemore*, 863 So. 2d at 37).

¶19.    Queen first argues that numerous statements made by Held were not contained in his expert report. Those statements are as follows:

a.      Held was asked, "[w]hen you talk about aggressiveness of dogs, is it common in your experience for a dog that is being trained to fight to be human friendly?" He responded, "[a]bsolutely. Organized dog fighting dogs are probably the most human friendly dogs out there because as a handler or person in the pit, you can't get bit by or wouldn't want to be bit by one of these dogs."

b.      Held testified that the significance of a heavy chain tethered to a dog is "that is a 24/7 conditioning tool for those animals that is constantly drug around by that dog as he is active on the chain building not only his muscle but his endurance."

8

c. Held also testified that almost every case that he had worked on was in a "rural yard, outside an urban area, a county—what we would call out in the country" and that those yards were used for "dog fighting."

d. Held testified about the significance of scarring on the dogs found on Queen's property. Held was shown a picture of a dog with scarring on its "face, head, neck, chest and front legs." He testified that he believed the scarring to be the result of being bitten by another dog and was consistent with dog fighting.

Queen failed to cite authority in support of his argument that Held's testimony should be excluded because his statements were not specifically included in his expert report. Further, although Held admitted that some things that he testified to were not contained in his report, Held's report is not part of the record on appeal. Therefore, we can find no abuse of discretion in the trial court's admission of Held's testimony.

¶20. Even so, Held's statements were based on his more than twenty years of experience as an animal-cruelty investigator. "Unless we can safely say that the trial court abused its judicial discretion in allowing or disallowing evidence so as to prejudice a party in a civil case, or the accused in a criminal case, we will affirm the trial court's ruling." *Jones v. State*, 918 So. 2d 1220, 1223 (Miss. 2005) (citing *McGowen v. State*, 859 So. 2d 320, 328 (Miss. 2003)). Queen failed to support his argument with evidence showing that the trial court abused its discretion by allowing Held to testify about his previous statements.

¶21. Queen argues that Held's testimony was outside of his qualification and expertise. Held testified about powders that had been found at the property and stated that "[t]here is testosterone powders; there is weight powders; most of them are conditioning or weight-gain

9

powders that are used in combination with training." Held stated that the powders were used "to build endurance, to build body mass or muscle; testosterone in the animal." Held was qualified as an expert in dog fighting. Held testified that these powders were commonly found at dog yards and were used to increase the "gameness" in dogs.[1] Therefore, Held's testimony that testosterone and weight-gain powders were used to build endurance and body mass is relevant and reliable based on his years of experience as an animal-cruelty investigator.

¶22.    Queen further takes issue with Held's testimony about an animal that he had observed at the property. Held stated that "[t]he obvious wound here is this dog had a fractured jaw and several other fresh wounds on it as well." Held also testified that antibiotics found at the scene were common because "[i]nfection is the number two killer of dogs that have been in fights and antibiotics are a staple with them." Queen contends that Held is not a veterinarian and did not have the experience, qualifications, or training to testify about the dogs' injuries or the purpose of antibiotics. Again, we disagree. Held testified that he had investigated hundreds of dog-fighting cases over his career and that his duties included medical evaluations of the dogs. In addition, Dr. Savant, a veterinarian, also testified that the dog had an extensive injury to her jaw bone. And it is common knowledge that antibiotics are used

---

[1]"Gameness" is the "ability of an animal to fight to the death." *32 Pit Bulldogs and Other Prop. v. Cnty. of Prentiss*, 808 So. 2d 971, 972 (Miss. 2002) (internal quotation marks omitted).

to fight infections. Therefore, the trial court did not abuse its discretion by allowing Held to testify about the dog's injuries and the purpose of antibiotics.

¶23. Because the trial court did not abuse its discretion by admitting Held's testimony, this issue lacks merit.

## II. Whether the State presented sufficient evidence to convict Queen of dog fighting.

¶24. Queen next contends that the State failed to present sufficient evidence to sustain the guilty verdicts. A sufficiency-of-the-evidence challenge is reviewed de novo. *Body v. State*, 318 So. 3d 1104, 1108 (Miss. 2021) (citing *Sanford v. State*, 247 So. 3d 1242, 1244 (Miss. 2018)). "When reviewing a challenge to the sufficiency of the evidence, 'the critical inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" *Id.* (quoting *Parish v. State*, 176 So. 3d 781, 785 (Miss. 2015)).

¶25. As Queen argues, this case involves only circumstantial evidence. Queen emphasizes that no direct evidence was presented and that no witness testified that he was present when the dogs were fighting or injured. In addition, Queen argues the State did not present evidence that Queen had actually fought a dog or was training dogs to fight. Mississippi Code Section 97-41-19(1) provides that

> If any person (a) shall sponsor, promote, stage or conduct a fight or fighting match between dogs, or (b) shall wager or bet, promote or encourage the wagering or betting of any money or other valuable thing upon any such fight or upon the result thereof, or (c) shall own a dog with the intent to willfully enter it or to participate in any such fight, or (d) shall train or transport a dog

11

for the purposes of participation in any such fight . . . he shall be guilty of a felony . . . .

Miss. Code Ann. § 97-41-19(1) (Rev. 2014).

¶26. Queen did not dispute that he was the owner of 29 1/2 Miracle Road or that he owned the dogs found on the property. Carla Dunn, an evidence technician with the Adams County Sheriff's Department, stated that when she arrived at the property, she witnessed badly injured dogs running loose. Dunn stated that, behind the house, a large number of dogs were tied in circular patterns to heavy logging chains. She testified that the dogs "were tied where they could not touch each other, but they were very close to each other and one small dog would be close to a large dog." She stated that multiple large dogs would be in a circle with a small dog in the middle.

¶27. After a warrant was obtained, Dunn collected as evidence heavy logging chains, bite sticks, intravenous (IV) bags containing saline, medicine bottles, vials of vitamins, muscle milk and other muscle-building items, several scales, and a treadmill. Dunn also collected a large box addressed to Queen that contained "bite sticks . . . collars and other items that were possibly used with medications and the IV bags . . . ."

¶28. Held testified that he saw approximately fifty dogs at Queen's residence. He stated that the dogs were separated by a very small margin and that, in his experience, the small amount of space "keeps [the] dog aggressive." Held testified that the dogs "are put on heavy chains in their chain space to allow them almost contact with another dog on almost all sides of those dogs for a reason, and that promotes the gameness in those dogs at all times, 24/7."

12

He stated that the chains at the scene weighed approximately thirty to forty pounds and that the chains were "conditioning tool[s]" for the dogs because the dogs were constantly dragging them around, which built muscle and endurance. He stated that the scene was "typical on almost every yard that [he had] been on . . . ."

¶29.    Held testified that the bite sticks[2] that were recovered from the property were commonly used to separate dogs after they had engaged in a fight. He testified that the scarring and fresh wounds that appeared on the dogs were generally on the face, head, neck, chest, and front legs and that he believed them to be the result of a dog fight.

¶30.    Regarding the testosterone powders and weight-gain powders, Held testified that they were used to build endurance in the dogs, to build body mass or muscle, and to increase testosterone. Held stated that the K-9 red cell that was found on the property was "a supplement or additive to the feet to improve the condition of that dog" and that it was commonly found in dog fighting and training to promote dogs to fight. Scales were also found on the property, and Held testified that the scales were significant because, "[j]ust like a boxing match[,] [t]he dogs are matched up for weight."

¶31.    Held testified that the saline-solution bags that were found at the scene were typically used to rehydrate an animal after a fight and were commonly found at dog yards. Antibiotics were found on the property, and Held stated that antibiotics were commonly found at dog-fighting yards to fight infection. Similarly, the iodine wound spray found at the scene was

---

[2]The bite sticks were also referred to as break sticks.

commonly found in yards used to promote and train fighting dogs, according to Held, and was used to discourage infections of open wounds in dogs that had been bitten by another dog. Held concluded that, based on his observations, training, and experience, Queen's property was used as a dog-fighting training yard. However, Held admitted that he did not find any evidence of betting or advertisements for future dog fighting.

¶32. Lastly, Dr. Robert Savant, a veterinarian, testified that the Adams County Sheriff's Department asked him to examine six "pit bull or pit bull like" dogs with grievous injuries that had been found on Queen's property. Dr. Savant testified that the dogs all had bite wounds and lacerations that were incurred from another dog. The dogs had to be humanely euthanized because of their injuries. Dr. Savant also visited Queen's property. He testified that he examined forty-seven dogs on that day and that three more had to be euthanized. Dr. Savant stated that, in his opinion, the dogs' injuries were consistent with dog fighting.

¶33. This Court previously has recognized that "a treadmill, 2 sets of weighing scales, various dietary supplements and medications, and 3 wooden 'break' sticks" were "items indicative of dog fighting." *32 Pit Bulldogs*, 808 So. 2d at 972 n.1; *see also Cooper v. State*, 200 So. 3d 1065, 1078 (Miss. Ct. App. 2016). Dunn collected as evidence heavy logging chains, bite sticks, intravenous (IV) bags containing saline, medicine bottles, vials of vitamins, muscle milk and other muscle building items, several scales, and a treadmill. She stated that unlabeled pill bottles also were found inside of a box on the property. These items were consistent with paraphernalia of dog fighting under this Court's precedent.

14

¶34. Further, testimony indicated that the dogs were tied to chains weighing approximately thirty to forty pounds and that the dogs were tied in a circular pattern with minimal room between each dog. Dunn testified that one small dog would be in the middle of the circle surrounded by larger dogs. Held testified that the way that Queen's yard was set up was "typical on almost every yard that [he] had been on" and was indicative of dog fighting or the training of dogs to be fought. Moreover, both Held and Dr. Savant testified that the injuries on many of the dogs found on Queen's property resulted from or were consistent with dog fighting.

¶35. And David Mark Floyd, who lives adjacent to Queen, testified that he had previously shown law-enforcement officers the back of Queen's property where a number of dead dogs had been dumped.

¶36. Section 97-41-19 prohibits the training of dogs for the purposes of participation in dog fights, as well as the owning and possession of paraphernalia for the purpose of facilitating such fights. Miss. Code Ann. § 97-41-19(1), (5). Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, the record shows that the State presented sufficient evidence at trial to support Queen's convictions.

**III.    Whether the trial court erred by denying Queen's motion to recuse.**

¶37. Queen's last contention is that the trial court erred by denying his motion for recusal. This Court reviews the denial of a motion to recuse under an abuse-of-discretion standard.

15

*Thomas v. State*, 249 So. 3d 331, 343 (Miss. 2018) (quoting *Patton v. State*, 109 So. 3d 66, 77 (Miss. 2012)). "On appeal, a trial judge is presumed to be both qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption." *Id.* (internal quotation marks omitted) (quoting *Patton*, 109 So. 3d at 77).

¶38.    Judge Debra Blackwell, who presided over Queen's trial, had been employed as an assistant district attorney for the Sixth Circuit Court District at the time Queen's indictment was returned. The Sixth Circuit Court District included Adams County. Queen's motion for recusal was based solely on that fact. Canon 3E(1) of the Code of Judicial Conduct states that a judge "should disqualify [herself] in proceedings in which [her] impartiality might be questioned by a reasonable person knowing all the circumstances or for other grounds provided in the Code of Judicial Conduct or otherwise as provided by law . . . ."

¶39.    Judge Blackwell denied Queen's motion to recuse on the grounds that she had not participated in Queen's case in any way, either indirectly or directly. She stated that she had not seen Queen's case file, had no knowledge of the case, and had not performed any work whatsoever on the case. Judge Blackwell stated that, while she was employed as an assistant district attorney, she was assigned to Amite and Franklin Counties and rarely participated in Adams County cases. After qualifying to run for circuit court judge, she said that she took specific steps to prevent any potential conflict from arising if she won the election. The State additionally stated that Queen's case was handled solely by assistant district attorney Tim

16

Cotton. Cotton had prepared the case for presentation to the grand jury, had presented the case to the grand jury, had prepared and signed the indictment, and had appeared at arraignment.

¶40.    This Court has found that "[w]here one actively engages in any way in the prosecution and conviction of one accused of a crime, he is disqualified from sitting as a judge in any matter which involves that conviction." *Miller v. State*, 94 So. 3d 1120, 1123 (internal quotation marks omitted) (quoting *Banana v. State*, 638 So. 2d 1329, 1330 (Miss 1994)). Queen cites *Jenkins v. State*, in which a judge had been serving as county prosecuting attorney for Smith County when he was appointed as special judge for the Smith County Circuit Court. *Jenkins v. State*, 570 So. 2d 1191, 1192 (Miss. 1990). Because the judge had been serving as prosecutor at the time of the defendant's indictment, he had acted as both accuser and the trier of fact. *Id.* at 1192. The Court stated that "no person can be considered to be impartial while that person is also acting as a partisan." *Id.* at 1193.

¶41.    However, here, Judge Blackwell had not participated in Queen's case in any way. Queen did not produce any evidence showing that Judge Blackwell had actively engaged in his case while she was an assistant district attorney or that she even had knowledge of his case. In *West v. State*, the defendant argued that a judge should have recused himself from the defendant's case because the judge had served as the district attorney during the same court term as when the defendant was indicted. *West v. State*, 131 So. 3d 583, 586 (Miss. Ct. App. 2013). Because no evidence had been presented that the judge had actively participated

in the defendant's case prior to prosecution, the Court of Appeals held that the issue lacked merit. *Id.* at 587; *see also* ***West v. Fisher***, No. 3:15cv83-DPI-FKB, 2018 WL 1883556, at *2 (S.D. Miss. Jan. 17, 2018) ("West's position is simply that the mere fact of the judge's having been the district attorney at the time of his arrest and up to the time immediately prior to his indictment resulted in a denial of due process at his trial. Neither ***Murchinson***[3] nor any other clearly established Supreme Court law requires recusal in such a case. For this reason, it cannot be said that all fairminded jurists would have concluded that West was denied due process by the trial judge's failure to recuse himself.").

¶42.     Similarly, Queen failed to provide evidence that created a reasonable doubt as to the validity of the presumption that Judge Blackwell was both qualified and unbiased. "We have said that, 'absent some showing of actual prejudice or bias, there was no error' in a judge presiding over a trial." ***Patton***, 109 So. 3d at 78 (quoting ***Jones v. State***, 841 So. 2d 115, 135 (Miss. 2003)). Accordingly, this issue lacks merit.

## CONCLUSION

¶43.     For the above reasons, we affirm Queen's convictions and sentences.

¶44.     **AFFIRMED.**

          **RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**

---

[3]***In re Murchison***, 349 U.S. 133, 75 S. Ct. 623, 99 L. Ed. 942 (1955).