# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00171-COA

DERRICK M. AMOS A/K/A DERRICK                 **APPELLANT**
MACHUN AMOS A/K/A DEIGO A/K/A DIEGO

v.

STATE OF MISSISSIPPI                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/12/2022 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/02/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. A Newton County Circuit Court jury convicted Derrick Amos of three counts of statutory rape in violation of Mississippi Code Annotated section 97-3-65(1)(a) (Rev. 2014). The circuit court sentenced Amos to serve a term of twenty years for Count I; ten years for Count II, to run consecutively to the sentence for Count I; and ten years for Count III, to run consecutively to the sentences for Counts I and II, all in the custody of the Mississippi Department of Corrections (MDOC). Amos now appeals his convictions arguing that his trial was rendered unfair due to the admission of other-bad-acts testimony in violation of Mississippi Rule of Evidence 404(b). After a review of the record, arguments of counsel,

and relevant law, we affirm Amos's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. During the summer of 2018, Jaime,[1] who was only fourteen years old, began using methamphetamine and engaging in sexual relationships with several older men whose ages ranged between thirty and forty years old. Around December 2018, Jaime met thirty-nine year old Derrick Amos, and in January 2019, she and Amos began communicating with one another through Facebook Messenger. A "romantic relationship" developed between Jaime and Amos around March or April 2019 and lasted until July 2019.

¶3. On July 14, 2020, a Newton County grand jury indicted Amos on three counts of statutory rape. According to the indictment, on or between May 1, 2019, and May 31, 2019, June 1, 2019, and June 30, 2019, and July 1, 2019, and July 31, 2019, Amos willfully, unlawfully, and feloniously engaged in sexual intercourse with Jaime in violation of Mississippi Code Annotated section 97-3-65(1)(a).[2]

¶4. A jury trial was held on December 13, 2021, and continued through December 14, 2021. Before the trial began, Amos's counsel filed a motion in limine to exclude evidence of additional crimes that Amos may or may not have committed. After the jury was

---

[1] To protect the minor's identity and privacy, the minor's name has been replaced with a fictitious name.

[2] Section 97-3-65(1)(a)(i) provides that the crime of statutory rape is committed when:

(a) Any person seventeen (17) years of age or older has sexual intercourse with a child who:

(i) Is at least fourteen (14) but under sixteen (16) years of age.

2

impaneled, the circuit court held a hearing on Amos's motion. Amos asserted that there was evidence produced during discovery that he had allegedly provided Jaime with illegal drugs and that Amos or others were involved in felony exploitation of a minor or sex trade of a minor. Because he was being charged with only statutory rape, Amos argued that it would be highly prejudicial to allow the State to introduce this evidence against him at trial.

¶5.     In response, the State argued that because it anticipated that Jaime would testify it was common for her and Amos to do drugs together and have sex, the evidence Amos sought to exclude was probative and relevant to show motive and opportunity to commit the crimes charged. In ruling on the motion, the circuit court stated that at that time, it was impossible to determine whether the evidence Amos sought to exclude was relevant. The circuit court noted that it could see how the evidence could be relevant if it revealed that Amos was providing drugs to Jaime as a way to obtain sexual favors or her cooperation. However, the circuit court held that it would withhold ruling on the evidence addressed in the motion until the evidence was offered during trial and after Amos made a timely objection.

¶6.     The State called eleven witnesses to testify at trial. Jaime testified first, stating that she began using methamphetamine in 2018, during the summer of her eighth-grade year. Jaime also testified about several sexual relationships with older men that she engaged in throughout that summer.[3] She stated that she met Amos for the first time in December 2018

---

[3] Jaime testified that before meeting Amos, she engaged in sexual relationships with Adrian Jackson, Anthony Arrington, Chuck McDonald, and Lakeevis Jackson.

while she "was at the blue house."[4] Jaime testified that she was lying in bed naked with Chuck McDonald when Amos knocked on the door and asked if McDonald would "shoot him up" with methamphetamine. Jaime stated that her next encounter with Amos occurred sometime in January 2019 after McDonald asked Amos to take Jaime and her friend Lindsey[5] home. According to Jaime, when she got out of the car, Amos asked for her number, and she told McDonald that he could give it to Amos. However, Jaime stated that most of the time she and Amos communicated with one another through Facebook Messenger.[6]

¶7. Jaime further testified that the first sexual encounter between her and Amos occurred at Scottie Pinson's home, but Jaime could not provide an exact date for when this encounter took place. According to Jaime, Amos took her to Pinson's home where they "had sex and then got right back home." Jaime stated that she and Amos were involved in a "regular romantic relationship" and that the relationship officially began around March or April 2019 and ended sometime in July 2019. Jaime stated that throughout the relationship, she and Amos would hang out on a daily basis and would do things like wash clothes and talk. Jaime also stated that she would spend the night at Amos's home and that Amos had been inside her home. Jaime further testified that she and Amos frequently had sex as part of their

---

[4] According to Jaime, the blue house was located in an area that she referred to as "the hill" in Union, Mississippi.

[5] To protect this minor's identity and privacy, her name has also been replaced with a fictitious name.

[6] Jaime stated that she and Amos exchanged messages from March 2019 until July 2019, when their relationship ended. Copies of the Facebook messages were entered into evidence.

4

relationship and that from May 2019 until July 2019, they had sex at least once each month.

¶8.     Jaime also testified about a sexual encounter between her and Amos that occurred around the end of May 2019, right before her fifteenth birthday. Jaime stated that she and Amos went to Pinson's home to "do drugs and have sex." Once there, she and Amos "chilled" for about twenty or thirty minutes before Amos left her "to go do something." Jaime stated that Amos was gone "for pretty much the rest of the day," and then he came back and left again. According to Jaime, Amos did not return after he left the second time, and later that evening the police showed up at Pinson's home. Jaime stated that when the police arrived, she ran and hid in a closet. Once located, Jaime was transported to the Union Police Department where she waited for her mother. According to Jaime, throughout their relationship Amos was aware of how old she was. She stated that she and Amos actually had a conversation about her age on the way to Pinson's home one day, and she told him that she would be "legal" in a year.

¶9.     Jaime's friend Lindsey testified next. She stated that during the latter part of 2018 and early 2019, she, Jaime, and several older men would hang out, "smoke dope[,] and have sex." Lindsey further stated that she had never seen Amos before but that Jaime had told her she and Amos had sex a few times.

¶10.    Investigator Steve Robinson with the Union Police Department testified that around midnight on May 22, 2019, Jaime was pulled over for a traffic violation by Officer Kenny Chipley and taken to the police station. Investigator Robinson stated that the car Jaime had been driving belonged to a known drug user named Tommy Boler, which concerned them.

At the station, Jaime's mother requested that the officers find out where Jaime had been. Jaime informed the officers that she had been going back and forth to Amos's house that night and that she was in a relationship with Amos. Investigator Robinson stated that this information led them to open an investigation for possible statutory rape charges.

¶11. Investigator Robinson further testified that on May 28, 2019, while conducting a safety checkpoint, a gentleman and younger lady drove up. According to Investigator Robinson, the young lady was Jaime's friend Lindsey. Investigator Robinson asked Lindsey if she knew of Jaime's whereabouts because Jaime's mother had been looking for her. Lindsey called Jaime to see where she was, and Jaime told her that she was at Pinson's home in Newton County. Investigator Robinson then called Deputy Chris Hollingsworth with the Newton County Sheriff's Department, who sent officers to Pinson's residence. Jaime was located inside Pinson's home and brought to the Union Police Department where her mother came and picked her up. Investigator Robinson further stated that after these two incidents in May, Jaime went to live with Bobbie Hodgins, whom Jaime referred to as her godmother.

¶12. After Investigator Robinson was excused, the circuit court held a suppression hearing regarding the search warrant that was obtained for Amos's residence. After finding that there was probable cause for the search warrant to be issued, the circuit court denied Amos's request to exclude the warrant.

¶13. Chief Deputy Chris Hollingsworth with the Newton County Sheriff's Department was called to testify next. He stated that in late May 2019, he was contacted by an investigator with the Union Police Department and that the investigator requested that he go to Pinson's

residence, which was located in the Little Rock community, to look for a juvenile female. Deputy Hollingsworth testified that he and several other deputies went to the residence where they found six people, including Jaime and Pinson. Jaime was found hiding in a closet in a bedroom in Pinson's home and was escorted to the Union Police Department where her mother was waiting for her. Amos was not located at the residence.

¶14. Pinson testified that during May and June 2019, he lived in Little Rock on Pleasant Grove Road in Newton County. He stated that he had seen Amos once or twice and that he knew Amos through friends. Pinson testified that he recalled an occasion, in late May 2019, when deputies from the Newton County Sheriff's Department came to his home and picked up a young girl. According to Pinson, at that time, a few people "hung out or lived at" his home. Pinson was also questioned about his drug use during this period:

State:      Okay. Did you use methamphetamine at that time?

Pinson:     Yes.

State:      Did you ever use it with or get it from Derrick Amos?

Pinson:     Yes.

After this colloquy, Amos's counsel objected and moved for a mistrial. The circuit court overruled Amos's motion for mistrial but sustained the objection and instructed the jury to disregard the State's last question and Pinson's answer.

¶15. Pinson further testified that on the day the deputies came to his home, he had seen Amos that morning. He stated that he and Amos had talked briefly in front of his home and that Amos told him he would be back after a while but never came back. According to

Pinson, Amos did not have anyone with him when he saw him. However, Pinson further stated that he remembered Jaime being at his home that day but did not know how she had gotten there.[7] When asked what reason Amos would have had to return to Pinson's home, Pinson stated, "[p]robably to stay the night." The State then elicited the following testimony from Pinson:

State: Okay. Did y'all have a discussion about him staying the night or using a room of yours?

Pinson: Yes.

State: Okay. Tell us about that.

Pinson: He said he'd just be back just later on and might spend the night.

State: Okay. Did - - was there any talk of payment for a room?

Pinson: He gave me a little marijuana.

State: Okay. As payment to use the room?

Pinson: Yes, sir.

State: Did he give you anything else?

Pinson: No, sir. I believe we done some meth earlier.

Amos's counsel objected and again moved for a mistrial, arguing that none of Pinson's testimony had anything to do with Jaime or the crime Amos was being charged with. In response, the State argued that Jaime's prior testimony had revealed that on this specific day, Jaime was found at Pinson's home, that she and Amos had used methamphetamine together,

_____

[7] On cross-examination, Pinson stated that he had never seen Jaime and Amos together before.

8

and that Amos had supplied the methamphetamine. Thus, the State argued that Pinson's testimony that he allowed Amos to use a room in exchange for these drugs was relevant. The circuit court agreed and denied Amos's motion.

¶16. Donnie Chunn testified that he knew Amos through a mutual friend and that throughout May, June, and July 2019, Amos had visited his home with Jaime. According to Chunn, on one occasion Jaime and Amos came to his home, and they all sat around and talked for about twenty or thirty minutes. During that time, he, Jaime, and Amos did methamphetamine together and Chunn stated that Amos had brought the drugs with him. Amos's attorney did not object after that portion of Chunn's testimony. He further stated that after they finished talking, Amos and Jaime went into the bedroom, and then the two left. On cross-examination, Chunn stated that he did not see Jaime or Amos having sex, nor did he think they had been in the bedroom long enough to do so.

¶17. Anthony Arrington, who was incarcerated for the statutory rape of Jaime, also testified at trial. Arrington stated that he and Jaime were good friends, that they had hung out together, and that he had pled guilty to having sex with her.[8] Arrington also stated that he had known Amos for several years and that they used to hang out and communicate with one another every other day. Arrington testified about a phone conversation that he had after he got arrested in October 2018. Arrington stated that he had called either McDonald or an individual named Kelly and had heard Amos talking in the background. According to Arrington, he heard Amos say, "[L]ittle momma got some good p****." Arrington stated

---

[8] Jaime testified that she and Arrington had been in a relationship during the summer of 2018, which lasted about a year, on and off, because Arrington was in and out of jail.

that he assumed Amos was either talking about Lindsey, Jaime, or Jaime's sister. Arrington also stated that when he confronted Jaime about whether she had been sexually involved with anyone else while he was incarcerated, Jaime cried and did not say anything.

¶18. Kendrick Green, who was incarcerated for the statutory rape of Lindsey, testified that he had hung out and gotten high with Jaime and Amos once or twice. He stated that Amos referred to Jaime as his "little buddy" and that Amos never indicated whether he and Jaime were having sex with one another.

¶19. As its last witness, the State called Agent Brad Edmondson of the Mississippi Bureau of Investigation who testified that on July 3, 2019, he assisted the Union Police Department with a statutory rape investigation concerning Jaime. Agent Edmondson stated that he had been briefed on the prior investigation that the Union Police Department had conducted before he joined the investigation, and he had also been shown messages that were exchanged between Amos and Jaime. Agent Edmondson stated that Hodgins had discovered the messages after she took Jaime's phone as punishment. While going through the phone, Hodgins came across the messages between Jaime and Amos and notified the Union Police Department. Based on what he had learned from the Union police officers and the messages from Jaime's phone, Agent Edmondson determined that he had gained enough probable cause to draft a search warrant for Amos's home. Agent Edmondson stated that from the messages exchanged between Amos and Jaime, he had interpreted a boyfriend/girlfriend type of situation and that he had interpreted some of the messages to be of a sexual nature.

¶20. Agent Edmondson also testified about the search warrant that he executed on July 8,

2019, for the search of Amos's home.[9] According to Agent Edmondson, the purpose of the warrant was to search Amos's residence to verify that the layout of the house that Jaime gave them was correct and to determine whether an iPad that belonged to Hodgins was located at the home. Agent Edmondson stated that during the search of the residence, there was a letter found on a bedside table next to Amos's bed and Hodgins's iPad was found on Amos's mother's bed. Agent Edmondson further testified that he also executed a search warrant for Jaime's phone.[10] A dump of the phone revealed approximately sixty Facebook Messenger phone calls made and received between Jaime and Amos from May 14, 2019, to July 2, 2019.[11] Agent Edmondson also stated that there were sexually explicit photographs saved on Jaime's phone. On cross-examination, Agent Edmondson admitted that there was no mention of the actual act of having sex in the messages exchanged between Amos and Jaime.

¶21. After calling its last witness, the State rested, and Amos moved for a directed verdict. Amos argued that the State had failed to "make out a case beyond a reasonable doubt for which the jury could find him guilty as a matter of law." Amos also renewed his motion for a mistrial, asserting that Pinson's testimony regarding the alleged drug sales or drug transfers between him and Amos was impermissible other-bad-acts evidence. The circuit court denied both motions, stating:

---

[9] Amos renewed his objection to the search warrant and testimony regarding what was found at Amos's home. The circuit court overruled the objection.

[10] Jaime's phone had been voluntarily turned over to the Union Police Department by Hodgins.

[11] The call log from Jaime's phone was entered into evidence without objection.

11

As to your motion for mistrial, as I recall, I sustained your objections to that line of questioning and instructed the jury to disregard it. And I don't believe this jury is going to decide this case based on something like that. There's plenty of other evidence for them to consider whether or not Mr. Amos is guilty of these crimes. And I give this jury enough credit to decide the case on that evidence. And they won't, in my opinion, be swayed by something minuscule as that. So that motion is, again overruled.

As for your motion for directed verdict, I'm of the opinion that the State has made out a prima facie case on all three counts. Therefore, your motion for directed verdict is also overruled.

Amos then rested without calling any witnesses.

¶22. At the conclusion of the trial, the jury found Amos guilty of all counts. On January 5, 2022, the circuit court sentenced Amos to serve a term of twenty years for Count I; ten years for Count II, to run consecutively to the sentence for Count I; and ten years for Count III, to run consecutively to the sentences for Counts I and II, all in the custody of the MDOC.

¶23. On January 20, 2022, Amos filed a motion for new trial asserting that the court erred by (1) refusing to grant a peremptory instruction and refusing to grant him a directed verdict; (2) refusing to grant each of his jury instructions; (3) sustaining every objection made by the State and overruling all of his objections; (4) allowing into evidence comments made by a witness regarding his drug use and drug sales or transfers; and (5) failing to grant his request for a mistrial. Amos also alleged that the jury's verdict was against the overwhelming weight of the evidence.

¶24. On January 25, 2022, the circuit court entered an order denying Amos's motion for a new trial. Amos now appeals, raising as his sole issue that his trial was rendered unfair due to the introduction of irrelevant and unduly prejudicial evidence that he allegedly provided

controlled substances to a State witness. Finding no error, we affirm Amos's convictions and sentences.

## STANDARD OF REVIEW

¶25. "The standard of review for admission of evidence is abuse of discretion." *Taylor v. State*, 330 So. 3d 758, 761 (¶7) (Miss. 2021). "The relevancy and admissibility of evidence are within the discretion of the trial judge and will not be reversed unless that discretion has been abused." *Tidwell v. State*, 806 So. 2d 1146, 1148 (¶7) (Miss. Ct. App. 2002). However, such "discretion must be exercised within the confines of the Mississippi Rules of Evidence," which state that "an error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected." *Id.* (quoting MRE 103(a)). Thus, "[u]nless the trial court abused its judicial discretion to the point of prejudicing the accused, this Court must affirm the trial court's ruling." *McGowen v. State*, 859 So. 2d 320, 328 (¶27) (Miss. 2003).

## DISCUSSION

### I.  Procedural Waiver

¶26.  Amos argues that Pinson's testimony regarding his alleged drug sales or drug transfers was inadmissible because it constituted evidence of other bad acts, which he argues was prohibited under Mississippi Rule of Evidence 404(b)(1).[12] He also asserts that Pinson's testimony was inflammatory and more prejudicial than probative of his guilt of statutory rape.

---

[12]  Mississippi Rule of Evidence 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

13

After a review of the record, we find that Amos failed to properly preserve this issue on appeal.

¶27.    In *Tidwell*, this Court held that "[i]n order to preserve an issue for appeal, the issue on appeal must be on the same grounds raised at trial." *Tidwell*, 806 So. 2d at 1148 (¶8). In that case, Tidwell was indicted for unlawfully taking his father and stepmother's vehicle. *Id*. at 1147 (¶2). At trial, Tidwell's father testified that Tidwell "had a history of alcohol and drug abuse and that he had once before stolen and wrecked a family vehicle." *Id*. at (¶3). He further stated that as a result, Tidwell had been forbidden from driving their vehicle. *Id*. at (¶4). Tidwell objected to his father's testimony, arguing that it was "improper." *Id*. In response, the State argued that "the information was necessary in order for the jury to understand why Tidwell did not have permission to drive their vehicle." *Id*. The circuit court agreed with the State and permitted the testimony. *Id*. At the end of the trial, the jury found Tidwell guilty, and he appealed arguing that "the trial judge erred in allowing the testimony concerning his history of drug and alcohol abuse." *Id*. at (¶5). On appeal, this Court held that Tidwell had waived the issue on appeal because "no specific objection to prior bad acts was stated on the record." *Id*. at 1148 (¶8). Thus, we affirmed the trial court's judgment. *Id*.

¶28.    In a more recent case, this Court also held that because the defense counsel objected to the prosecutor's questioning on grounds other than the basis that the questioning violated Rule 404(b), Kidd waived the right to raise the claim on appeal. *Kidd v. State*, 284 So. 3d 777, 785 (¶36) (Miss. Ct. App. 2019).

¶29.    Turning to the case at hand, at trial Amos's objection to Pinson's testimony was based

on relevance, not inadmissibility of other bad acts under Rule 404(b).  Thus, as this Court held in *Tidwell* and *Kidd*, we find that because Amos objected to the testimony on relevancy grounds, and not on Rule 404(b) grounds, he failed to properly preserve the objection and waived the right to bring forth the issue on appeal.  However, notwithstanding the procedural bar, we find no merit to this issue because Pinson's testimony regarding Amos's alleged drug use and drug transfers was necessary to tell a complete story and was integrally related in time, place, and fact to the crime for which Amos was being charged.

## II.     Admission of Other-Bad-Acts Evidence

¶30.    "Generally, Rule 404(b) prohibits evidence of a crime, wrong, or other act used to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Wooten v. State*, 348 So. 3d 359, 365 (¶19) (Miss. Ct. App. 2022).  "But there are a variety of exceptions to this prohibition." *Bowman v. State*, 283 So. 3d 154, 164 (¶38) (Miss. 2019).  Most of these exceptions are found in Mississippi Rule of Evidence Rule 404(b)(2), which, *Bowman* explains, provides that "evidence of other crimes *may* be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id*. at 165 (¶38).  However, this list is not exhaustive. *Id*.  "Trial judges also have [the] discretion to admit evidence of other crimes or bad acts for reasons not listed in Rule 404(b)(2), like telling the complete story so as not to confuse the jury." *Id*.  However, prior to admitting the other-bad-acts evidence, a trial judge must filter the evidence through Mississippi Rule of Evidence 403. *Id*. at (¶39).  "Under Rule 403, when weighing admission of relevant evidence, a trial judge may exclude relevant

evidence if its probative value is substantially outweighed by the danger of unfair prejudice."

*Id.*

¶31. In *Bowman*, the Mississippi Supreme Court held that the defendant was not harmed by the testimony admitted at his trial regarding his prior drug and alcohol use because such testimony was necessary to present the jury with a complete story. *Bowman*, 283 So. 3d at 160 (¶15). In that case, Bowman was indicted and tried for attempted murder, burglary, and aggravated assault after his wife alleged that he broke into the Southland Plantation hunting camp and attacked her and the camp's caretaker. *Id.* at 158 (¶3). At trial, the State sought to introduce evidence of Bowman's increasing drug and alcohol use to show his frame of mind on the day of the assault and burglary. *Id.* at 166 (¶45). After a proffer was made outside the presence of the jury, the trial court admitted the wife's testimony "about Bowman's prior drug and alcohol use to show an absence of mistake and the *res gestae* – the complete story." *Id.* at 167 (¶47). However, the court made it clear that it "would not allow the State to mention Bowman's alcohol and drug use as a gratuitous attempt to show Bowman is a bad guy or something like that." *Id.* at 166 (¶45). At the end of the trial, the jury convicted Bowman of one count of burglary of a dwelling, and Bowman appealed arguing, among other things, that the trial court erred by admitting evidence of his prior drug and alcohol abuse. *Id.* at 164 (¶36).

¶32. On appeal, the Mississippi Supreme Court stated that "[e]vidence of prior substance abuse has been allowed . . . to show an absence of mistake and to tell a complete story." *Id.* at 167 (¶48). The court held that the testimony regarding Bowman's drug use was allowed

to "explain the couple's deteriorating relationship and resulting abuse and to tell the story leading to Bowman's burglary and the attempted-murder charge." *Id*. at (¶49). Thus, the supreme court held that even if the testimony regarding Bowman's drug use was inadmissible he was not harmed by such testimony. *Id*. at 170 (¶61). The court affirmed Bowman's conviction and sentence. *Id*.

¶33. In the present case, Amos asserts that Pinson's testimony constituted inadmissible evidence of other bad acts. During the trial, Pinson stated the following:

Pinson:     He said he'd just be back just later on and might spend the night.

State:      Okay. Did - - was there any talk of payment for a room?

Pinson:     He gave me a little marijuana. Okay.

State:      As payment to use the room?

Pinson:     Yes, sir.

State:      Did he give you anything else?

Pinson:     No, sir. I believe we done some meth earlier.

¶34. Amos argues that this testimony violated Mississippi Rule of Evidence 404(b)(1) and that its prejudicial value outweighed its probative value. We disagree. Before the trial began, the circuit court held a hearing on Amos's motion in limine. The State argued that evidence of Amos's drug transfers and drug use was relevant to show motive and opportunity. The circuit court withheld ruling on the motion until the testimony was elicited during trial and Amos timely objected.

¶35. During the trial, Jaime testified that throughout their relationship she and Amos used drugs and had sex together. Jaime specifically stated that on one occasion Amos took her to

17

Pinson's home to "do drugs and have sex." Jaime, as well as other witnesses, also testified that they did drugs with Amos, and that Amos usually supplied the drugs. Chunn testified, without objection, that he, Amos, and Jaime all used methamphetamine together. Amos and Jaime's Facebook Messenger exchanges also referenced drugs. Thus, although Pinson's testimony involved Amos's prior drug use and alluded to the fact that Amos had supplied Pinson with drugs in exchange for a room at his home, as this Court held in *Bowman*, such testimony went to the *res gestae* and was necessary to provide the jury with a complete story.

¶36. We also note that at the end of the trial, the jury was given the following jury instruction:

> The Court instructs the Jury that prior acts testified about are acts relating to charges for which the defendant is not presently on trial and are to be considered only for the limited purpose of showing proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. You cannot and must not infer that the defendant acted in conformity with his previous acts and that he is guilty of the charge for which he is presently on trial for.

Therefore, we find that any prejudice Amos may have suffered was harmless because Pinson's testimony was necessary to provide the jury with a complete story regarding the circumstances that led to the statutory rape charges.

## CONCLUSION

¶37. Accordingly, we affirm Amos's convictions and sentences.

¶38. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

18